**No. 2015-1946**

IN THE

## UNITED STATES COURT OF APPEALS

FOR THE FEDERAL CIRCUIT

---

### WI-FI ONE, LLC,

*Appellant,*

v.

### BROADCOM CORPORATION,

*Appellee.*

---

*Appeal from the United States Patent and Trademark Office,*
*Patent Trial and Appeal Board in Case No. IPR2013-00636*

---

## OPENING BRIEF OF APPELLANT
## WI-FI ONE, LLC

---

G. Donald Puckett
Steven Joseph Udick
SKIERMONT PUCKETT LLP
2200 Ross Ave.
Suite 4800W
Dallas, TX 75201
(214) 978-6600

Douglas A. Cawley
MCKOOL SMITH, P.C.
300 Crescent Court
Suite 1500
Dallas, TX 75201
(214) 978-4972

Peter J. Ayers
LEE & HAYES PLLC
11501 Alterra Parkway
Suite 450
Austin, TX 78758
(512) 605-0252

*Attorneys for Appellant Wi-Fi One, LLC*

# CERTIFICATE OF INTEREST

Counsel for the Appellant, Wi-Fi One, LLC, certifies the following:

1.     The full name of every party or amicus represented by me is:

**Wi-Fi One, LLC**

2.     The name of the real party in interest (if the party named in the

caption is not the real party in interest) represented by me is:

**Wi-Fi One, LLC**

3.     All parent corporations and any publicly held companies that own 10

percent or more of the stock of the party or amicus curiae represented by me are:

**Wi-Fi One, LLC is 100% owned by Optis Wi-Fi Holdings, LLC.**

4.     The names of all law firms and the partners or associates that

appeared for the party or amicus now represented by me in the trial court or agency

or are expected to appear in this Court are:

**LEE & HAYES, PLLC**
Peter Ayers
J. Christopher Lynch
John Shumaker

**SKIERMONT PUCKETT LLP**
G. Donald Puckett
Steven Joseph Udick
Sarah E. Spires

**MCKOOL SMITH, P.C.**
Douglas A. Cawley

i

Dated: October 26, 2015        Respectfully submitted,

/s/ Donald Puckett

G. Donald Puckett
Steven Joseph Udick
SKIERMONT PUCKETT LLP
2200 Ross Avenue, Suite 4800W
Dallas, Texas 75201
(214) 978-6600 (telephone)
(214) 978-6601 (facsimile)
Donald.Puckett@skiermontpuckett.com
Steve.Udick@skiermontpuckett.com

Douglas A. Cawley
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
(214) 978-4972 (telephone)
(214) 978-4044 (facsimile)
dcawley@mckoolsmith.com

Peter J. Ayers
LEE & HAYES PLLC
11501 Alterra Parkway, Suite 450
Austin, TX 78758
(512) 605-0252 (telephone)
(512) 605-0252 (facsimile)
peter@leehayes.com

*Attorneys for Appellant,*
*Wi-Fi One, LLC*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ...............................................................i

TABLE OF CONTENTS.................................................................... iii

TABLE OF AUTHORITIES ..............................................................vi

STATEMENT OF RELATED CASES ...................................................x

I.    STATEMENT OF JURISDICTION ..............................................1

II.   STATEMENT OF THE ISSUES ..................................................2

III.  STATEMENT OF THE CASE ......................................................4

IV.   STATEMENT OF FACTS ............................................................5

    A.    Procedural History...............................................................5

    B.    The Indemnity Agreements and the Relationship Between
        Broadcom and the District Court Defendants ......................6

    C.    The '625 Patent and the IPR Decision .................................9

V.    SUMMARY OF THE ARGUMENT ...........................................15

VI.   ARGUMENT................................................................................17

    A.    The Board's Final Written Decision should be reversed or
        vacated in light of 35 U.S.C. §315(b). ...............................17

        1.    Standard of Review – Section 314(d) does not preclude
            all appellate review of the Board's §315(b)
            determinations..........................................................17

            a.    There is a strong presumption against
                unreviewability of agency actions. The agency
                bears a heavy burden to overcome this
                presumption. ..................................................18

b.     Section 314(d) does not evidence a clear intent to preclude judicial review of the §315(b) time-bar. ..........20

c.     The Federal Circuit retains jurisdiction to review the Board's violation of a clear statutory directive. The jurisdictional versus nonjurisdictional distinction is irrelevant. ...................................................24

d.     In the alternative, this Court can review the §315(b) issue for critical legal errors or serious procedural violations; or else treat this appeal as a petition for writ of mandamus. .......................................27

2.     The Board's Final Written Decision must be reversed or vacated because its resolution of the §315(b) issue was both substantively and procedurally flawed. ...........................28

a.     The Board applied a fundamentally flawed legal standard that was too rigid and narrow, and that undermines the basic purpose of the "real party in interest or privy" language in §315(b)............................28

b.     The Board turned a blind eye to the most relevant facts, such as the known indemnity agreements.............32

c.     The Board did not adequately set forth its reasons and supporting evidence, and its findings are not supported by substantial evidence. .................................35

3.     The Board's §315(b) determination should be reversed or vacated by appellate review or by mandamus. .........................38

B.     The Board's unpatentability determinations are erroneous and should be reversed. ..............................................................................41

1.     Standard of Review ..................................................................41

2.     The Board erred in concluding that Hettich anticipates Claim 1 of the '625 Patent. ........................................................42

iv

       a.     Overview of Hettich ......................................................42

       b.     The Board erred in concluding that Hettich teaches the "commanding a receiver to release" limitation. .......44

       c.     The Board erred in concluding that Hettich teaches the "discarding unacknowledged packet" limitation. ......................................................................48

CONCLUSION ....................................................................51

ADDENDUM

  A. Final Written Decision 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73..........A001

  B. Decision on Request for Rehearing 37 C.F.R. § 42.71(d)......................A0324

  C. U.S. Patent No. US 6,424,625 B1 ........................................................A0038

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs., Inc. v. Gardner*,
   387 U.S. 136 (1967)................................................................ 30, 31

*Achates Reference Publ'g, Inc. v. Apple, Inc.*,
   2015 U.S. App. LEXIS 17183 (Fed. Cir. Sept. 30, 2015).................... passim

*Aruze Gaming Macau, Ltd. v. MGT Gaming, Inc.*,
   IPR2014-01288, Paper No. 13 (PTAB Feb. 20, 2015)................................42

*Atar S.r.l. v. United States*,
   730 F.3d 1320 (Fed. Cir. 2013) ...................................................47

*Atchison v. Wichita Board of Trade*,
   412 U.S. 800 (1973).................................................................48

*Austin Road Co. v. Occupational Safety and Health Review Comm'n*,
   683 F.2d 905 (5th Cir. 1982) .......................................................48

*Bowen v. Michigan Academy of Family Physicians*,
   476 U.S. 667 (1986).................................................................31

*Brisco v. Bell*,
   432 U.S. 404 (1977)................................................................34

*City of Arlington v. FCC*,
   133 S.Ct. 1863 (2013)......................................................... passim

*Consol. Edison Co. v. N.L.R.B.*,
   305 U.S. 197 (1938) ...............................................................54

*Daiichi Sankyo Co., Ltd. v. Lee*,
   791 F.3d 1373 (Fed. Cir. 2015) ....................................... 44, 47, 51

*Director, Office of Workers' Compensation Programs*,
   826 F.2d 1319 (3d Cir. 1987) ......................................................47

*Ericsson, Inc. v. D-Link Systems, Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014) ............................................................. 17, 18

*GTNX, Inc. v. Inttra, Inc.*,
  789 F.3d 1309 (Fed. Cir. 2015) ...................................................................40

*In re Cuozzo Speed Tech's*,
  793 F.3d 1268 (Fed. Cir. 2015) ...................................................................40

*In re Dominion Dealer Sols., LLC*,
  749 F.3d 1379 (Fed. Cir. 2014) ...................................................................52

*In re Telefonaktiebolaget LM Ericsson*,
  564 Fed. Appx. 585 (Fed. Cir. 2014) ...........................................................21

*Intel Corp. v. U.S. Int'l Trade Comm'n*,
  946 F.2d 821 (Fed. Cir. 1991) .....................................................................45

*Ismailov v. Reno*,
  263 F.3d 851 (8th Cir. 2001) .......................................................................34

*Japanese Found. for Cancer Research v. Lee*,
  773 F.3d 1300 (Fed. Cir. 2014) ............................................................. 50, 51

*Leedom v. Kyne*,
  358 U.S. 184 (1958)........................................................................... 31, 39, 51

*Lindahl v. OPM*,
  470 U.S. 768 (1984)............................................................................... 35, 39

*Mach Mining, LLC v. EEOC*,
  135 S.Ct. 1645 (2015)............................................................................ passim

*McDougal-Saddler v. Herman*,
  184 F.3d 207 (3d Cir. 1999) .......................................................................34

*Microsoft Corp. v. Proxyconn, Inc.*,
  789 F.3d 1292 (Fed. Cir. 2015) ...................................................................53

*National Coalition to Save Our Mall v. Norton*,
    269 F.3d 1092 (D.C. Cir. 2001) .................................................................34

*NMB Sing. Ltd. v. United States*,
    557 F.3d 1316 (Fed. Cir. 2009) .................................................................48

*Pregis Corp. v. Kappos*,
    700 F.3d 1348 (Fed. Cir. 2012) .................................................................32

*Reflectix, Inc. v. Promethean Insulation Tech. LLC*,
    IPR2015-00039, Paper No. 18 (PTAB Apr. 24, 2015) .................................42

*Reilly v. Office of Personnel Mgmt.*,
    571 F.3d 1372 (Fed. Cir. 2009) ........................................................... passim

*SKF USA, Inc. v. United States*,
    630 F.3d 1365 (Fed. Cir. 2011) .................................................................47

*Teva Pharmaceuticals U.S.A., Inc. v. Sandoz, Inc.*,
    135 S. Ct. 831 (2015) ...............................................................................53

*Versata Dev. Grp., Inc. v. SAP Am., Inc.*,
    793 F.3d 1306 (Fed. Cir. 2015) ........................................................... passim

*Zoll Lifecore Corp. v. Philips Elecs. N. Am. Corp.*,
    IPR 2013-00609, Paper No. 15 (PTAB Mar. 20, 2014) ........................ 43, 49

## Statutes

5 U.S.C. § 556 .........................................................................................47

5 U.S.C. § 556(d) ....................................................................................46

5 U.S.C. § 556(e) .....................................................................................46

5 U.S.C. § 702 .........................................................................................30

5 U.S.C. § 704 .........................................................................................34

5 U.S.C. § 706 .........................................................................................30

5 U.S.C. § 8347 .................................................................................35

5 U.S.C. § 8347(c) ............................................................................35

28 U.S.C. § 1295(a) ..........................................................................13

35 U.S.C. § 102(b) ............................................................................26

35 U.S.C. § 141(c) ............................................................................13

35 U.S.C. § 142 .................................................................................13

35 U.S.C. § 314 .................................................................................13

35 U.S.C. § 314(d) ...................................................................... passim

35 U.S.C. § 318(a) ............................................................................13

35 U.S.C. § 319 ........................................................................ 13, 34

35 U.S.C. § 324(e) ..................................................................... 31, 32

**Other Authorities**

154 Cong. Rec. S9989 (daily ed. Sept. 27, 2008) ...................................42

**Regulations**

37 C.F.R. § 41.108 ............................................................................13

37 C.F.R. § 42.20(c) ..........................................................................48

37 C.F.R. § 42.51(b)(2) .....................................................................44

37 C.F.R. § 42.73 ..............................................................................13

37 C.F.R. § 90.3 ................................................................................13

Trial Practice Guide,
    77 Fed. Reg. 48,756 (Aug. 14, 2012) ...................................... 41, 42

## STATEMENT OF RELATED CASES

In accordance with Federal Circuit Rule 47.5(a) and (b), appellant states:

1.     The following petition for writ of mandamus was previously before this Court, arising from the same *inter partes* review proceeding that is now at issue in this appeal:

- *In re Telefonaktiebolaget LM Ericcson*, Nos. 2014–127, –128, and –129 (decided on May 5, 2014).  The panel was composed of Judges Lourie, Dyk and Reyna (with Judge Lourie authoring the opinion). This opinion was designated non-precedential and is reported as 564 Fed. Appx. 585 (Fed. Cir. 2014).

2.     The following pending cases are companions to this appeal in that they arise from *inter partes* review proceedings involving the same parties; involve final written decisions that were entered on or about the same day; and involve common issues of law and fact related to the issues arising under 35 U.S.C. §315(b) (but also involve distinct issues of law and fact pertaining to the different patents involved):

- *Wi-Fi One, LLC v. Broadcom Corporation, Fed. Cir. No. 2015-1944.*
- *Wi-Fi One, LLC v. Broadcom Corporation, Fed. Cir. No. 2015-1945.*

3.    The following district court case may be directly affected by the outcome of this appeal:

- *Ericsson, Inc., Telefonaktiebolaget LM Ericsson, and Wi-Fi One, LLC v. D-Link Systems, Inc., Netgear, Inc., Acer, Inc., Acer America Corporation, Gateway, Inc., Dell, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation, Intel Corporation, and Belkin International, Inc.*, No. 10-cv-0473, in the United States District Court for the Eastern District of Texas.

- An appeal was previously taken and decided from that case. The appeal was styled *Ericsson, Inc. v. D-Link Systems, Inc.*, Fed. Cir. Nos. 2013-1625, -1631, -1632, -1633; 773 F.3d 1201 (Fed. Cir. 2014). This appeal was decided on December 4, 2014.  The panel was composed of Judges O'Malley, Taranto, and Hughes (Judge O'Malley filed the opinion and Judge Taranto filed an opinion dissenting in part).

# I.     STATEMENT OF JURISDICTION

The Patent Trial and Appeal Board (the "Board") asserted jurisdiction over this case under 35 U.S.C. §314 and instituted the case for trial pursuant to 37 C.F.R. §42.108. (A137.)  The Board then issued its Final Written Decision pursuant to 35 U.S.C. §318(a) and 37 C.F.R. §42.73 on March 6, 2015. (A1–37.) Wi-Fi One then filed a Request for Rehearing of the Final Written Decision, (A306–23, which was denied by the Board on June 1, 2015. (A324–33.)

Patent Owner Wi-Fi One, LLC timely filed a Notice of Appeal on July 13, 2015, pursuant to 35 U.S.C. §142 and 37 C.F.R. §90.3. (A334–40.) The Notice of Appeal was received and docketed by this Court on August 25, 2015. The Court has jurisdiction over this appeal pursuant to 28 U.S.C. §1295(a) and 35 U.S.C. §§141(c) and 319.

## II.    STATEMENT OF THE ISSUES

1.    Where certain litigation defendants are time-barred from filing a petition for *inter partes* review under 35 U.S.C. §315(b), and the Patent Owner has presented evidence of an indemnity relationship and other coordination between Broadcom and some of the time-barred litigation defendants:

> (a)    Did the PTAB err in applying a legal standard under §315(b) under which it is irrelevant if the litigation defendants had the right to control, or were actually controlling, Broadcom's IPR activities?

> (b)    Did the PTAB err in refusing to allow Patent Owner any discovery on the §315(b) issue, and in refusing to consider evidence known to be relevant to the §315(b) issue, such as the known indemnity agreements?

> (c)    Did the PTAB err by failing to provide a clear statement of the reasons and evidence supporting its implied finding that the §315(b) time-bar does not apply?

> (d)    Are the PTAB's errors related to the §315(b) issue reviewable by this Court in light of 35 U.S.C. §314(d)?

2.    Whether claim 1 of the '625 Patent is patentable over Hettich:

2

(a)     Did the Board err in finding claim 1 of the '625 Patent anticipated by Hettich where no substantial evidence supports its finding that Hettich discloses the "commanding a receiver to release" limitation?

(b)     Did the Board err in finding claim 1 of the '625 Patent anticipated by Hettich where no substantial evidence supports its finding that Hettich discloses the "discarding unacknowledged packet" limitation?

### III.    STATEMENT OF THE CASE

This is an appeal from an *inter partes* review ("IPR") decision by the Patent Trial and Appeal Board ("PTAB" or the "Board") finding all challenged claims of U.S. Patent No. 6,424,625 (the "'625 Patent") to be unpatentable. (A1–37.)  The PTAB issued its final written decision on March 6, 2015. (*Id.*) Appellant timely filed a request for rehearing of the final written decision, which the PTAB denied on June 1, 2015. (A306–23; A324–33.) Appellant then filed its notice of appeal to this Court. (A334–40.)

During the pendency of the IPR below, patent owner Telefonaktiebolaget LM Ericsson ("Ericsson") transferred ownership of the '625 Patent to new patent owner Wi-Fi One, LLC ("Wi-Fi One"), and Wi-Fi One was substituted as the patent owner in the IPR. Throughout this brief, references to "Patent Owner" or "Appellant" are intended to refer alternatively to either Ericsson or Wi-Fi One, whichever owned the patent at the relevant time being discussed.

# IV.    STATEMENT OF FACTS

## A.    Procedural History

The '625 Patent previously was before the Federal Circuit in *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201 (Fed. Cir. 2014). In that case, the Federal Circuit affirmed a jury verdict and district court judgment finding that two other asserted Patents[1] had been infringed; but the Court remanded the case for a new trial on damages. *See id.* at 1236-37.  The district court litigation against D-Link and seven other defendants was filed by Ericsson (as the then-owner of the '625 Patent) on September 24, 2010 (the "District Court Litigation"). It is undisputed that each of the defendants (the "District Court Defendants") would themselves have been subject to the one-year time-bar of 35 U.S.C. §315(b) if they had filed the IPR petition because they had been sued for patent infringement of the '625 Patent more than one year prior to the filing of the IPR petition. (A105.)

IPR Petitioner and Appellee Broadcom Corporation ("Broadcom") was not named as a defendant in the District Court Litigation and has never itself been sued

---

[1] The Ericsson patents that were asserted in the same case are U.S. Patent Nos. 6,772,215 and 6,466,568. Each of these patents has also been found to be unpatentable by the PTAB in separate IPR proceedings, and each of these patents is the subject of a co-pending appeal to this Court. *See* Federal Circuit Appeal Nos. 15-1944 and 15-1945.

for infringing the '625 Patent. But on September 20, 2013—shortly after the

district court entered its final judgment —Broadcom filed the petition for IPR

below. The PTAB granted the IPR petition on March 10, 2014. (A136–37.)

While Broadcom and Ericsson were litigating the IPR in the PTAB, the

parties to the District Court Litigation proceeded with the Federal Circuit appeal

which ultimately resulted in a remand of the case to district court for a retrial on

damages. *See D-Link,* 773 F.3d at 1236-37. Before the new trial on damages was

held, however, the PTAB in the IPR below entered its final written decision

finding all challenged claims of the '625 Patent to be unpatentable. (A1–37.)

## B.     The Indemnity Agreements and the Relationship Between Broadcom and the District Court Defendants

Although Broadcom itself has never been sued for infringement of the '625

Patent, it is undisputed that there is a significant relationship between Broadcom

and at least some of the District Court Defendants with respect to the infringement

claims asserted by Patent Owner in that case. The relationship between Broadcom

and the District Court Defendants is relevant to whether the IPR petition below

was time-barred under 35 U.S.C. §315(b).

In its motion for additional discovery and also in its Patent Owner Response,

Patent Owner presented strong evidence that Broadcom has been closely

coordinating with some of the District Court Defendants in opposing the '625

Patent. (A63–65 (sealed), A74–76 (redacted); A165–77 (sealed), A230–42 (redacted).) Indeed, the close ties between Broadcom and its customer-defendants were well summarized by the Board in its motion denying the requested discovery. (A110–19.) The factual nature of this evidence is largely undisputed.

For example, Broadcom acknowledged in the IPR petition that certain Broadcom products, such as the "BCM4313" and "BCM4321" chips, form the basis for some of the '625 Patent infringement allegations made by Patent Owner in the District Court Litigation. (A358.) It also is undisputed that there are at least two indemnity agreements between Broadcom and certain District Court Defendants that cover the '625 Patent infringement allegations in district court. (A2089 (district court order noting the existence of at least two indemnity agreements and indemnity-related email); A113 (Board order noting the existence of indemnity agreements).) The specific terms of the indemnity relationships are not known, however, because the indemnity agreements have not been made a part of the record, despite the diligent efforts of Patent Owner. It also is undisputed that for many years Broadcom has been working in coordination with at least some of the District Court Defendants with respect to the defense of the infringement allegations in the District Court Litigation. (A63–65 (sealed), A74–76 (redacted); A110–19.) And it is undisputed that Broadcom took other affirmative steps to

7

collaterally attack the asserted patents on behalf of its customers—the District Court Defendants. (A64, A68 (sealed); A75, 79 (redacted).)

Presumably, the indemnity agreement itself would shed more light on the nature of the relationship between Broadcom and its customers who are District Court Defendants – particularly regarding the parties' respective rights to control litigation or IPR decisions. The indemnity agreement was produced to Patent Owner's counsel subject to a protective order in the District Court Litigation, but the terms of the district court protective order precluded the agreement from being offered as an exhibit in the IPR below. (A2089–92.)

Patent Owner has made every effort to have the indemnity agreement included in the IPR record. Patent Owner first moved the district court to modify the protective order to allow the known indemnity agreements to be introduced in the IPR, but this request was denied. (*Id.*) The district court judge held that "granting Ericsson relief from the protective order would undermine the negotiations which produced the Protective Order." (A2091.) Patent Owner then filed a motion for additional discovery in the IPR below seeking, *inter alia*, production of the indemnity agreements. (A62–72 (sealed); A73–83 (redacted).) The motion for additional discovery was opposed by Broadcom, and all requested discovery (including production of the known indemnity agreements) was denied

8

by the Board. (A84–93 (redacted brief ); A94–103 (unredacted brief); A104–20 (order).) Patent Owner moved for rehearing of this decision, but the request for rehearing also was denied. (A121–29; A136–38.) Patent Owner then pursued a writ of mandamus to compel the PTAB to order all or part of the requested discovery, but the Federal Circuit declined to issue mandamus relief. *See In re Telefonaktiebolaget LM Ericsson*, 564 Fed. Appx. 585 (Fed. Cir. 2014).

Thus, the Board below did not have the benefit of the known indemnity agreements (or any of the other discovery requested by Wi-Fi One) when it overruled Patent Owner's contention that the petition is time-barred under 35 U.S.C. §315(b), and implicitly held that none of the District Court Defendants is a "real party in interest or privy" of Broadcom.

## C.    The '625 Patent and the IPR Decision

The '625 Patent is entitled "Method and Apparatus for Discarding Packets in a Data Network having Automatic Repeat Request." (A51 at 1:1–4.) Automatic Repeat Request or "ARQ" refers to a telecommunications technique for requesting data packets that have been lost or corrupted during transmission. (A51 at 1:7–10.) As the '625 Patent explains, ARQ techniques are "used to ensure reliable data transfer and protect data sequence integrity." (A51 at 1:13–15.)

To help ensure data integrity, data packets are typically assigned a sequence number so that the sequence of data transmission can be reassembled properly by the recipient.  (A51 at 1:20–22.)  Packets received in the correct order are forwarded to the next higher layer in the network for further processing.  (A51 at 2:66–67.)  But packets that arrive out of order or are not correctly received are not processed by the recipient until the lost or erroneous packets are received correctly. (A51 at 2:3–27, 2:66–3:10.)

While data integrity is important to a communication protocol, bandwidth usage is also a critical design parameter.  Normally, "it is desirable to transfer all packets without any packet loss."  (A52 at 3:46–47.)  But in certain applications, stale or delayed (outdated) data may be useless to the receiver.  (A52 at 3:47–51.)  Delay-sensitive applications include "telephony, video conferencing and delay sensitive control systems."  (A52 at 3:51–53.)  In situations where data packets have a limited lifetime, bandwidth usage can be enhanced by "not sending (or resending) significantly delayed or outdated data packets."  (A52 at 4:9–13.)

There are three main ARQ protocols for providing transmission rules for transferring packets to a receiver in a particular order, each with its own data requirements: Stop-and-Wait, Go-Back-N, and Selective Reject (or Selective

Repeat).  (A51 at 1:23–25.)  Generally, "Selective Reject is most efficient, Stop-and-Wait is least efficient, and Go-Back-N is intermediate."  (A51 at 1:28–30.)

The '625 Patent discloses and claims ARQ techniques that do not transmit stale data packets and thus "minimize bandwidth usage by accounting for data packets that have an arbitrary but limited lifetime."  (A52 at 4:16–19.)  Several different embodiments that "discard outdated data packets" are disclosed in the '625 Patent.  (A52 at 4:22–25.)  In particular, the '625 Patent allows receivers to skip or overlook discarded packets (*e.g.*, release any expectation of receiving discarded packets).  (A53 at 5:18–25.)  Thus, the transmitter discards packets that are outdated, and also informs a receiver that it should not expect to receive those discarded packets.  (A53 at 5:15–27.)  By doing so, the '625 Patent provides a bandwidth efficient ARQ protocol for communications applications.

In one embodiment, a transmitter that discards a packet, "orders a receiver to accept the next packet, by setting a certain Receiver Packet Enforcement Bit (RPEB) in the ARQ header of the next packet and sending the packet to the receiver."  (A53 at 5:28–32.)  The RPEB bit forces the receiver to accept the received packet.  (A53 at 5:32–33.)  The preferred embodiment of an ARQ packet is illustrated in Fig. 8 of the '625 Patent:



FIG. 8

(A45.) Here the ARQ packet 810 includes an ARQ header 812 and a data portion 818. (A53 at 5:33–35.) "The header 812 includes a receive packet enforcement bit RPEB 814, and a k-bit sequence number N(S) 816." (A53 at 5:35–37.)

The ARQ packet 810 can be used under various conditions to cause a receiver to stop waiting for one or more packets. First, if a negative acknowledgement ("NACK") is sent by an ARQ receiver and is properly received by an ARQ transmitter, and further if "the NACK is valid for one discarded data packet, then the next data packet to be retransmitted can have an RPEB set to TRUE." (A53 at 5:43–48.) Alternatively, if a retransmission timer expires for one or more data packets causing those data packets to be discarded, the "next incoming data packet to be transmitted, or the first data packet to be retransmitted,

12

can have an RPEB set to TRUE." (A53 at 5:49–54.)  In any event, "[w]hen a correct packet with RPEB=TRUE is received, then all packets preceding this packet and up to the next outstanding packet will be released from the buffer and forwarded to the next higher layer." (A55 at 9:1–4.)

Representative Claim 1 is reproduced below:

> A method for discarding packets in a data network employing a packet transfer protocol including an automatic repeat request scheme, comprising the steps of:
>
> a transmitter in the data network commanding a receiver in the data network to
>
> a) receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet and
>
> b) **release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet**; and
>
> the transmitter **discarding all packets for which acknowledgment has not been received**, and which have sequence numbers prior to the at least one packet.

(A55 at cl. 1.)

In the IPR below, the Board found that this claim is anticipated under 35 U.S.C. §102(b) by the Hettich reference. (A25.)  As described in detail below, however, the Board's decision is not supported by substantial evidence.

## V.     SUMMARY OF THE ARGUMENT

The Board's final written decision below must be reversed or vacated because the Board erred in two fundamental respects.

First, the Board's resolution of the time-bar issue under 35 U.S.C. §315(b) was fundamentally flawed. The Board applied an incorrect legal standard for determining whether one or more District Court Defendants is a "real party in interest or privy" of Broadcom. Under the Board's erroneous standard, it is irrelevant even if the District Court Defendants directly controlled Broadcom's conduct in the IPR below. Moreover, the Board purposefully refused to consider relevant evidence, such as the known indemnity agreements. Additionally, the Board's orders fail to articulate reasons or evidence in favor of its implied determination that §315(b) does not apply in this case. All credible evidence in the record indicates that the petition below was time-barred, and the Board's actions in this case violate the statutory directive of §315(b).

The recent *Achates* case notwithstanding, the Federal Circuit may review the §315(b) issue on appeal. The *Achates* court did not consider the most recent Supreme Court authorities rejecting a jurisdictional/nonjurisdictional distinction and instructing federal courts to treat all statutory directives to administrative agencies as impacting the agency's authority. Nor did *Achates* properly consider

the strong presumption against unreviewability and previous Federal Circuit cases preserving some scope of judicial review, even considering much stronger statutory language restricting reviewability of an agency action. In the alternative, the court should treat this appeal as a petition for mandamus in order to correct the Board's errors in its §315(b) determination.

Second, the Board's unpatentability determination was erroneous for several reasons. After recognizing that the Delay PDU of Hettich does not meet the "at least one packet" limitation of the challenged claim, the Board inexplicably determined that the Delay PDU nonetheless meets this limitation.  Such inconsistent reasoning belies the Board's erroneous findings.  Because Hettich fails to meet the commanding a receiver to release, and discarding unacknowledged packet of the challenged claims, this Court should vacate the Board's Final Written Decision and hold that Appellee has not shown that the challenged claims of the '625 Patent are invalid.

# VI.    ARGUMENT

**A.    The Board's Final Written Decision should be reversed or vacated in light of 35 U.S.C. §315(b).**

### 1.    Standard of Review – Section 314(d) does not preclude all appellate review of the Board's §315(b) determinations.

In *Achates Reference Publ'g, Inc. v. Apple, Inc.*, 2015 U.S. App. LEXIS 17183 (Fed. Cir. Sept. 30, 2015), the Federal Circuit recently held that the PTAB's 35 U.S.C. §315(b) determination in that case was not reviewable on appeal in light of 35 U.S.C. §314(d).[2] *See id.* at *16.  Patent Owner respectfully contends that *Achates* was either wrongly decided, or else cannot be applied so strictly or so broadly as to preclude all judicial review of the Board's §315(b) determinations in every case.

In light of the Supreme Court and Federal Circuit authority discussed below (and not considered in *Achates*), the proper reading of §314(d) is that it precludes interlocutory appeal of the Board's decision on whether to institute a case for trial, but that it has little if any effect on the **reviewability**, on appeal of a final written decision, of issues related to the Board's compliance with statutory directives such as the time-bar of §315(b). At a *minimum* this Court retains jurisdiction to review

---

[2] At the time Patent Owner files this brief, the deadlines have not passed for Achates to request a panel rehearing, *en banc* rehearing, or file a petition for *certiorari* to the U.S. Supreme Court.

the PTAB's §315(b) determinations to set aside agency actions that result from critical legal errors and/or from substantial deviations from a party's important procedural rights. *See, e.g. Reilly v. Office of Personnel Mgmt.*, 571 F.3d 1372, 1376-79 (Fed. Cir. 2009).

> ### a.   There is a strong presumption against unreviewability of agency actions. The agency bears a heavy burden to overcome this presumption.

Congress endorsed a strong presumption in favor of judicial review of agency actions when it passed the Administrative Procedures Act (the "APA"). *See Abbott Labs., Inc. v. Gardner*, 387 U.S. 136, 140 (1967); *see also* 5 U.S.C. §702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action, *is entitled to judicial review thereof*.")[3]. Under the APA, Courts "*shall decide* all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of an agency action." 5 U.S.C. §706. Section 706 further provides a laundry list of the review standards courts are instructed to apply in reviewing agency actions. *Id.*

Even when Congress has enacted a statutory limitation to judicial review of an agency action, the federal courts possess an inherent ("nonstatutory") power to

---

[3] Throughout this brief, all emphasis in quotations is added, unless otherwise noted.

18

invalidate agency actions that are "*ultra vires,*" when the agency violates a clear

statutory mandate. *See Leedom v. Kyne*, 358 U.S. 184, 190-91 (1958); *see also*

*Achates*, 2015 U.S. App. LEXIS 17183 at *16-17 (discussing *Leedom*).

Just last term, the Supreme Court reaffirmed this very strong presumption

against unreviewability. *See Mach Mining, LLC v. EEOC*, 135 S.Ct. 1645, 1651

(2015). "Congress rarely intends to prevent courts from enforcing directives to

federal agencies. For that reason, this Court applies a 'strong presumption'

favoring judicial review of administrative action." *Id.*; *see also Bowen v. Michigan*

*Academy of Family Physicians*, 476 U.S. 667, 670-72, 672 n.3 (1986) (discussing

the historical roots of the presumption against unreviewability and collecting

Supreme Court authority).

Citing *Mach Mining*, the Federal Circuit recently recognized and reaffirmed

"the strong presumption that Congress intends judicial review of administrative

action . . . ." *Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1320 (Fed.

Cir. 2015). In *Versata*, the court considered limitations on appealability contained

in 35 U.S.C. §324(e), which applies to "post-grant reviews" and "covered business

method reviews," but which is textually identical to §314(d).[4] The *Versata* court

---

[4] In its decision applying §324(e), the Federal Circuit looked to previous cases
interpreting and applying §314(d).  *See Versata*, 793 F.3d at 1316-17.

19

noted that the presumption of reviewability is controlling when there is any doubt about congressional intent to completely preclude judicial review, and held that notwithstanding the language of §324(e) the Federal Circuit retains jurisdiction to review whether a particular patent qualifies for covered business method review. *See Versata*, 793 F.3d at 1319-21.

While the presumption against unreviewability can be rebutted by the agency when the text or structure of the statute indicates that Congress intended the agency to police itself, "***the agency bears a 'heavy burden'*** in attempting to show that Congress 'prohibited all judicial review' of the agency's compliance with a legislative mandate."  *Mach Mining*, 135 S.Ct. at 1651 (emphasis added).

> **b.     Section 314(d) does not evidence a clear intent to preclude judicial review of the §315(b) time-bar.**

"To determine whether a particular statute precludes judicial review, we look to its express language, the structure of the statutory scheme, its legislative history and purpose, and the nature of the administrative action involved." *Pregis Corp. v. Kappos*, 700 F.3d 1348, 1357-58 (Fed. Cir. 2012).

The America Invents Act, which created the new *inter partes* review ("IPR") proceeding, contains a limitation on the appealability of the Director's institution decisions. Section 314(d) states: "The determination by the Director whether to institute an inter partes review under this section shall be ***final and***

20

*nonappealable*." 35 U.S.C. §314(d). In *Achates*, the court relied upon §314(d) to conclude that the PTAB's §315(b) determinations at the institution stage are not only immune from interlocutory appeal, but also that they are not ***reviewable*** on an appeal of a final written decision. *See Achates*, 2015 U.S. App. LEXIS 17183 at *16. Unlike the present case, in *Achates* the PTAB had initially made a §315(b) determination in its institution decision that was revisited in its final written decision.[5]

The language of §314(d) and the structure of the Act, however, do not provide clear evidence that Congress intended the USPTO to police itself with respect to all statutory mandates related to the IPR institution decisions, including the time-bar of §315(b). By its plain text, the statute does not state that the Director's institution decision is not "reviewable." Instead, it merely states that the institution decision is "final and nonappealable." The plain text is most reasonably read as no more than a prohibition on interlocutory appeals, given the interlocutory

---

[5] In this case, the Board did not make any determination regarding §315(b) in its institution decision. (A136–57.) The Patent Owner first fully briefed its §315(b) arguments in the Patent Owner Response. (A165–72 (sealed); A228–40 (redacted).) The Board never meaningfully addressed these arguments. Even in its Final Written Decision, the Board merely incorporated by reference its reasons for denying Patent Owner's request for discovery, rather than making a reasoned determination of the §315(b) issue. (A7–8.)

21

nature of the Board's institution decision. *See Versata,* 793 F.3d at 1319 n.8

(noting that, under the APA, an agency initiation of a proceeding is considered

interlocutory).

Congress expressly provided full appellate rights from the PTAB's final

written decision. *See* 35 U.S.C. §319 ("A party dissatisfied with the final written

decision of the Patent Trial and Appeal Board under section 318(a) may appeal the

decision pursuant to sections 141 through 144."). Moreover, the APA specifies that

nonappealable interlocutory agency rulings are ordinarily reviewable on appeal of

the agency's final decision. *See* 5 U.S.C. §704 ("A preliminary, procedural, or

intermediate agency action or ruling not directly reviewable is subject to review on

the review of the final agency action.").

In cases involving other statutory schemes, where courts have found

complete unreviewability of an agency action, the relevant statute clearly and

expressly preclude ***judicial review*** by courts. *See, e.g., Brisco v. Bell*, 432 U.S. 404

(1977) (holding that provision of Voting Rights Act precluded all judicial review

where statute stated that certain determinations "shall not be reviewable in any

court"); *Ismailov v. Reno*, 263 F.3d 851, 854-55 (8th Cir. 2001) (similar); *National

Coalition to Save Our Mall v. Norton*, 269 F.3d 1092, 1094-95 (D.C. Cir. 2001)

(similar); *McDougal-Saddler v. Herman*, 184 F.3d 207, 211-14 (3d Cir. 1999)

(similar); *see also Lindahl v. OPM*, 470 U.S. 768, 780-81 (1984) ("[W]hen Congress intends to bar judicial review altogether, it typically employs language far more unambiguous and comprehensive . . . .").

In *Reilly*, for example, the Federal Circuit considered statutory language from the Civil Service Retirement Act which provided that certain agency decisions "are final and conclusive and ***are not subject to review***." *See Reilly*, 571 F.3d at 1376-77 (discussing 5 U.S.C. §8347(c)). The *Reilly* court nonetheless held that this "seemingly unequivocal language" did not overcome the strong presumption against unreviewability. *Id.* Instead, the court held that this statutory language still permits judicial review of the agency's decision for "critical legal errors" or whether the agency made a "substantial departure from important procedural rights." *See id.* at 1377; *see also Lindahl*, 470 U.S. at 791 ("The Federal Circuit erred in concluding that §8347, as amended, altogether bars judicial review of MSPB decisions in retirement disability cases.").

The statutory language of §314(d), limiting appealability but not reviewability, is a much weaker restriction on judicial review than the language considered in *Reilly* and *Lindahl*. If the courts in *Reilly* and *Lindahl* permitted some scope of judicial review for critical or serious legal errors and procedural

violations, then *at a minimum* the same judicial review should be available under §314(d).

> c. **The Federal Circuit retains jurisdiction to review the Board's violation of a clear statutory directive. The jurisdictional versus nonjurisdictional distinction is irrelevant.**

The *Achates* court justified its holding, and distinguished *Versata*, on the grounds that §315(b) is nonjurisdictional, as opposed to the jurisdictional issue presented in *Versata*. *See Achates*, 2015 U.S. App. LEXIS 17183 at *13-15. But recently, the Supreme Court completely rejected this distinction as being both contrived and irrelevant. *See City of Arlington v. FCC*, 133 S.Ct. 1863, 1868-71 (2013). Under the Supreme Court's recent jurisprudence, ***all*** statutory directives from Congress serve to constrain the power and authority of administrative agencies.

The Supreme Court's rejection of the jurisdictional / nonjurisdictional distinction could not have been more unequivocal:

> No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its authority*. . . . Both their power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires. Because the question – whether framed as an incorrect application of agency authority or an assertion of authority not conferred – is always whether the agency has gone beyond what

24

Congress permitted it to do, ***there is no principled basis for carving out some arbitrary subset of such claims as "jurisdictional."***

*Id.* at 1868-69. "The reality, laid bare, is that there is *no difference*, insofar as the validity of agency action is concerned, between an agency's exceeding the scope of its authority (its 'jurisdiction') and its exceeding authorized application of authority it unquestionably has." *Id.* at 1870 (emphasis in original). The Supreme Court strongly discouraged judges from ever attempting to sort out jurisdictional versus nonjurisdictional administrative statutes:

> In sum, judges should not waste their time in the mental acrobatics needed to decide whether an agency's interpretation of a statutory provision is "jurisdictional" or "nonjurisdictional." Once those labels are sheared away, it becomes clear that the question in every case is, simply, whether the statutory text forecloses the agency's assertion of authority, or it does not. . . . The federal judge as haruspex, sifting the entrails of vast statutory schemes to divine whether a particular agency interpretation qualifies as "jurisdictional" is not engaged in reasoned decisionmaking.

*Id.* at 1870-71.

Even more recently in *Mach Mining*, when the Supreme Court considered whether a similar statutory limit on appeal precluded all judicial review of the EEOC's compliance with a statute requiring conciliation, the Court did not attempt to determine if the relevant statute was jurisdictional or nonjurisdictional. Instead,

the Court merely treated the relevant statute as a "congressional directive." *See*

*Mach Mining*, 135 S.Ct. at 1651-53.

For these same reasons, the jurisdictional / nonjurisdictional distinction

cannot reconcile the Court's holdings in *Versata* and *Achates.* The *Achates* court

framed the issue by stating that §315(b)'s time bar is not jurisdictional as it does

not affect the PTAB's authority ***to invalidate a particular patent*** because a

different party who is not time barred could file a proper petition. *Achates*, 2015

U.S. App. LEXIS 17183 at *13. But the issue could just as easily be reframed to

shift the focus away from the Board's authority over a particular patent, and

instead focus on the Board's delegated authority to act on a particular ***IPR petition***.

*See City of Arlington*, 133 S.Ct. at 1870 ("The [jurisdiction] label is an empty

distraction because every new application of a broad statutory term can be

rephrased as a questionable extension of the agency's jurisdiction.")

Under §315(b), Congress prohibited the PTAB from exercising its authority

to institute a petition that is time-barred. When the PTAB improperly institutes a

time-barred petition it violates this congressional directive and exceeds its

authority—end of story. *See City of Arlington*, 133 S.Ct. at 1874 ("The fox-in-the-

henhouse syndrome is to be avoided  . . . by taking seriously, and applying

rigorously in all cases, statutory limits on agencies' authority.").

26

The *Achates* decision did not cite *City of Arlington*, and it did not attempt to justify the significance it placed on the jurisdictional / nonjurisdictional distinction. Nor does the *Achates* decision cite *Reilly, Lindahl* or *Mach Mining*. Appellant respectfully contends that the *Achates* decision did not properly consider the most relevant legal authorities, and that it was wrongly decided.

The language of §314(d) notwithstanding, this Court should retain jurisdiction, on appeal of the Board's final written decisions, to review the Board's compliance with clear congressional directives such as the time-bar of §315(b). *See Leedom*, 358 U.S. at 190-91; *see also Mach Mining*, 135 S.Ct. at 1651-53; *City of Arlington*, 133 S.Ct. at 1874-75. Such a holding would be in accord with *Versata*, which held that the PTAB's rulings regarding compliance with a congressional directive (§18 in that case) are reviewable on appeal from a final written decision. *See Versata*, 793 F.3d at 1320-21.

> **d.    In the alternative, this Court can review the §315(b) issue for critical legal errors or serious procedural violations; or else treat this appeal as a petition for writ of mandamus.**

If the Court is inclined to adopt a standard of review that is less than full appellate review, Appellant urges this Court to at least adopt a rule allowing for the Court to review the PTAB's §315(b) determinations to ensure, at a minimum, that the PTAB has not committed a critical legal error or made a substantial departure

27

from important procedural rights. This holding would be consistent with *Reilly*, 571 F.3d at 1377.

Finally, if the Court determines that the PTAB's §315(b) determination is not subject to review on appeal, Appellant asks the Court to treat this appeal as a petition for writ of mandamus. *See, e.g.*, *In re Cuozzo Speed Tech's*, 793 F.3d 1268, 1274 (Fed. Cir. 2015) ("[M]andamus may be available to challenge the PTO's decision to grant a petition to institute IPR after the Board's final decision in situations where the PTO has clearly and indisputably exceeded its authority."); *GTNX, Inc. v. Inttra, Inc.*, 789 F.3d 1309, 1312 (Fed. Cir. 2015) ("[W]e may treat the appeal as, in the alternative, a request for mandamus relief under §1651.").

> ### 2. The Board's Final Written Decision must be reversed or vacated because its resolution of the §315(b) issue was both substantively and procedurally flawed.

> #### a. The Board applied a fundamentally flawed legal standard that was too rigid and narrow, and that undermines the basic purpose of the "real party in interest or privy" language in §315(b).

The Board committed a critical and serious legal error because it applied the wrong legal standard in making its §315(b) determination. Specifically, in deciding whether one or more District Court Defendants is a "real party in interest or privy of the petitioner," the Board imposed a hard and absolute requirement that Broadcom must have had the right to control the District Court Litigation in order

28

to find that a District Court Defendant was a real party in interest or privy. Under the Board's legal standard, it is ***irrelevant*** if a District Court Defendant has an absolute right to control Broadcom's conduct of the IPR (and even if it has been exercising actual control all along, such that Broadcom is a mere shill). This rigid legal standard defies logic, and it is contrary to both the text and purpose of the "real party in interest or privy" language of §315(b).

Section 315(b) states:

**Patent Owner's Action.** – An inter partes review may not be instituted if the petition requesting the proceeding is filed more than 1 year after the date on which the ***petitioner, real party in interest, or privy of the petitioner*** is served with a complaint alleging infringement of the patent. . . .

35 U.S.C. §315(b).

The plain text of the statute makes clear that the "real party in interest, or privy of the petitioner" language in § 315(b) is intended to prevent litigation defendants from subverting the statutory time-bar by having their agents or cohorts file an IPR petition that they themselves are time-barred from filing. The USPTO's Patent Trial Guide confirms this purpose behind the "real party in interest, or privy" language. *See* Trial Practice Guide, 77 Fed. Reg. 48,756 at 48,759 (Aug. 14, 2012) (One of the "core functions" of the real-parties-in-interest or privies language is to "protect patent owners from harassment via successive petitions ***by***

29

*the same or related parties* . . . ."). Thus, to accomplish the statutory purpose, the

legal standard for "real party in interest or privy of the petitioner" must be broad

enough to allow the PTAB to determine whether one or more District Court

Defendants have attempted to circumvent the §315(b) time-bar by having

Broadcom file the IPR petition for them and/or at their direction or control.

 The legislative history and official public comments of the USPTO

demonstrate that the applicable legal standard must be flexible and multi-faceted so

that individual cases can be judged on their unique circumstances. *See* 154 Cong.

Rec. S9989 (daily ed. Sept. 27, 2008) (statement of Sen. Kyl) (discussing the

breadth of "privy" as explained by recent case law developments); *see also* Trial

Practice Guide, 77 Fed. Reg. at 48759-60.

 The Board has applied a broad and flexible legal standard —looking both at

whether a petitioner controls related district court litigation and also whether the

district court litigants control the IPR—in practically every recent §315(b) case.

*See, e.g.*, *Aruze Gaming Macau, Ltd. v. MGT Gaming, Inc.*, IPR2014-01288, Paper

No. 13 at 10-12 (PTAB Feb. 20, 2015) (discussing how "litigation through a

proxy" satisfies the real party in interest standard); *Reflectix, Inc. v. Promethean*

*Insulation Tech. LLC*, IPR2015-00039, Paper No. 18 at 9-10 (PTAB Apr. 24,

2015) (collecting cases in which the PTAB has found a non-party to be a real party

30

in interest due to the nonparty's control or connection with the IPR proceeding);

*Zoll Lifecore Corp. v. Philips Elecs. N. Am. Corp.*, IPR 2013-00609, Paper No. 15

at 10-13 (PTAB Mar. 20, 2014) (same).

In this case, however, the Board inexplicably applied a narrow and rigid

legal standard that focused exclusively on whether Broadcom has a right to control

the District Court Litigation.  The Board made it abundantly clear that it viewed

the District Court Defendants' right to control this IPR to be of no importance

whatsoever. (A110 ("To show privity requires a showing that Broadcom would be

bound by the outcome of the Texas litigation. To be bound, in normal situations,

Broadcom ***must have had control over the Texas Litigation***."); A114 ("The

totality of the evidence fails to amount to more than a 'mere possibility' that

Broadcom ***controlled, or could have controlled, the Texas litigation***."); A115–16

("[T]he IPR filings fail to show control over the Texas Litigation. The evidence

does not amount to more than speculation that any of Broadcom's activity

constitutes evidence of collusion with the D-Link defendants in the Texas

Litigation ***in a manner that would bind Broadcom to the outcome thereof.***");

A118 ("The evidence and arguments fail to show that the sought-after discovery

would have more than a mere possibility of producing useful privity information,

i.e., ***that Broadcom controlled or could have controlled the Texas Litigation***.");

31

*see also* (A7–8 (Final Written Decision); A326–28 (order denying request for rehearing).)

The Board's erroneous legal standard undermines both the plain text and purpose of §315(b), allowing a time-barred district court litigant to easily circumvent the statutory time-bar by simply employing an agent or shill to file an otherwise time-barred petition. This is a nonsensical result, and it substantially undermines the very purpose of the "real party in interest or privy of the petitioner" language from §315(b).

Because the Board applied the wrong legal standard to its §315(b) determination, its decision must be reversed. *See Daiichi Sankyo Co., Ltd. v. Lee*, 791 F.3d 1373, 1379 (Fed. Cir. 2015) ("An agency abuses its discretion when its decision is based on an erroneous interpretation of the law.").

> **b.    The Board turned a blind eye to the most relevant facts, such as the known indemnity agreements.**

Relying upon 37 C.F.R. §42.51(b)(2), Patent Owner moved for "additional discovery" of evidence that would show the level of coordination and control between Broadcom and the District Court Defendants. (A62–72 (sealed); A73–83 (redacted); A1671–78.) Patent Owner presented strong evidence that Broadcom and one or more of the District Court Defendants were closely coordinating their opposition to the '625 Patent, either in the District Court Litigation, in the IPR

32

below, or in both. (A63–65, A68 (sealed); A74–76, A79 (redacted).) The Board,

however, denied Patent Owner any discovery on the issue. (A104–20; A130–35.)

The Board even refused to compel Broadcom to produce the known indemnity

agreements, which are almost certainly the most relevant evidence related to

coordination and control between Broadcom and its customers who are District

Court Defendants.

Whatever discretion may be afforded the Board's discovery rulings, that

discretion was abused in this case. Patent Owner's point of error, however, is more

than just a complaint that the Board misapplied the standards for deciding a

discovery motion. The Board's error here is more fundamental. The requested

discovery goes to the heart of whether the IPR petition was time-barred when it

was filed, and thus goes to whether the Board itself has complied with the statutory

directive under §315(b). To arrive at the factually correct ruling, the Board by

necessity must look at the known indemnity agreements. *See, e.g.*, *Intel Corp. v.

U.S. Int'l Trade Comm'n*, 946 F.2d 821, 839 (Fed. Cir. 1991) (noting that the

existence of an indemnity agreement alone, in many cases, has been sufficient for a

finding of privity).

The Board's order denying the requested discovery gives no coherent

explanation as to why the Board views the indemnity agreement (and other

requested discovery) as being irrelevant. The Board's order focuses on what it alleges to be deficiencies in Patent Owner's proof. (A110–19.) But, as discussed in the previous section, the Board's order is premised upon a fundamentally incorrect legal standard. The Board's reasoning also is circular because it finds fault with Patent Owner's proof regarding control, and uses the alleged lack of proof as a reason to deny Patent Owner access to the proof regarding control. For example, the Board found that Broadcom's filing of the IPR petition is not relevant to the privity issue because Patent Owner "does not show how IPR filings and other filings were pursuant to indemnity agreements . . . ." (A115–16.) But how could Patent Owner make that showing without having access to the indemnity agreement itself, or other requested discovery?

The Board's denial of discovery and refusal to consider the known indemnity agreements violated important procedural protections of the APA. The Board has an obligation to consider all relevant evidence on the issue. *See* 5 U.S.C. §556(d) ("A sanction may not be imposed or rule or order issued ***except on consideration of the whole record*** . . . ."). The Board's complete denial of discovery to Patent Owner, given the strong evidence submitted in support of the motion for additional discovery, violated Petitioner's right to present contrary evidence under the APA. *See* 5 U.S.C. §556(e) ("When an agency decision rests on

34

official notice of a material fact not appearing in the evidence in the record, a party

is entitled, on timely request, to an opportunity to show to the contrary.").

"Although §556 does not command that agencies admit all relevant

evidence, courts have often reversed agencies for excluding 'facts and

circumstances relevant to its inquiry which upon due consideration may be

persuasive weight in the exercise of its discretion." *Director, Office of Workers'*

*Compensation Programs*, 826 F.2d 1319, 1331 (3d Cir. 1987) (collecting cases);

*see also Daiichi*, 791 F.3d at 1379 (agency action is arbitrary where it "fails to

examine the relevant data"); *SKF USA, Inc. v. United States*, 630 F.3d 1365, 1373

n.3 (Fed. Cir. 2011) (agency action is arbitrary where it "entirely failed to consider

an important aspect of the problem").

> **c.     The Board did not adequately set forth its reasons
> and supporting evidence, and its findings are not
> supported by substantial evidence.**

An agency has an obligation to provide a reasoned explanation for its

actions. *See, e.g.*, *Atar S.r.l. v. United States*, 730 F.3d 1320, 1325 (Fed. Cir. 2013)

("To review the reasonableness of agency action, courts look for a reasoned

analysis or explanation of an agency's decisions as a way to determine whether a

particular decision is arbitrary, capricious, or an abuse of discretion.") The

agency's decision must set forth facts establishing its own authority to act, and its

35

compliance with statutory directives regarding the proper exercise of its delegated authority. *See, e.g.*, *Austin Road Co. v. Occupational Safety and Health Review Comm'n*, 683 F.2d 905, 908 (5th Cir. 1982). Moreover, where (as here) the agency's actions substantially deviate from its actions in other similar cases, the agency has an obligation to provide a clearly articulated statement of reasons and evidence justifying the departure. *See, e.g.*, *Atchison v. Wichita Board of Trade*, 412 U.S. 800, 808-09 (1973); *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1331 (Fed. Cir. 2009).

In this case, the Board never expressly decided the §315(b) issue. Instead, it denied Patent Owner discovery on the issue, and then adopted the same reasoning by reference in its final written decision. (A7–8.) The Board's orders were entirely based on Patent Owner's alleged failure of proof, and the orders make no attempt to set forth reasons that §315(b) does not apply.[6] Significantly, the Board never set forth ***even one fact*** supporting its implied conclusion that no District Court Defendant is a "real party in interest or privy."

---

[6] It is unclear which party bears the burden of proof to show whether the time-bar applies under 35 U.S.C. §315(b), and the Federal Circuit did not address this issue in *Achates*. Under the PTAB's rules, a party requesting relief has the burden of proof to show it is entitled to the relief requested. *See* 37 C.F.R. §42.20(c). Arguably, this would place the burden of proof on a petitioner to show that its petition is not time-barred.

Contrary to the Board's conclusion, all of the credible evidence in the record supports the opposite conclusion – even without considering the specific terms of the known indemnity agreement. Patent Owner made a strong evidentiary showing that Broadcom and at least some of its customers who are Texas Defendants have been in cahoots in defending against the '625 Patent both in the Texas Litigation and in this IPR, as previously discussed.

Significantly, Broadcom had an opportunity to present evidence that the District Court Defendants are not coordinating or controlling aspects of this IPR – but Broadcom chose to present no evidence on this point at all. Tellingly, Broadcom's proof was carefully worded to focus narrowly and exclusively on Broadcom's ties to the District Court Litigation, and to avoid any mention of the District Court Defendants' role in directing or controlling this IPR. (A88 (redacted); A98 (sealed); A1446–48 (sealed).) In other similar cases, the Board has placed weight on a petitioner's failure to provide evidence of the non-party's lack of participation in or control over the IPR. *See, e.g., Zoll*, IPR2013-00609, Paper No. 15 at 11-12.

Patent Owner's evidence, even if circumstantial to some degree regarding the District Court Defendants' control of this IPR, should be sufficient to carry the day *in the absence of any articulated evidence to the contrary.* This is particularly

true where the most relevant evidence (such as the known indemnity agreements) is within the possession and control of Broadcom, yet Broadcom chose not to put that evidence in the record and instead has taken every available step to keep the most relevant evidence out of the record.

Because the Board did not articulate facts showing that it acted within its statutory authority as prescribed by 35 U.S.C. §315(b), and because its implied findings are not supported by substantial evidence, the final written decision should be reversed or vacated. *See Japanese Found. for Cancer Research v. Lee*, 773 F.3d 1300, 1304 (Fed. Cir. 2014) ("[A]n agency acts arbitrarily or capriciously . . . if it fails to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.").

### 3.     The Board's §315(b) determination should be reversed or vacated by appellate review or by mandamus.

The *Achates* decision notwithstanding, the foregoing errors are reviewable by this Court in this appeal of the final written decision for several reasons. First, the Board's action was *ultra vires* because it failed to set forth facts and reasons demonstrating its compliance with the statutory directive of §315(b). Under the rule established in *Versata*, §314(d) does not preclude the Board from reviewing the Board's determinations that relate to the Board's compliance with statutory

directives. The *City of Arlington* case makes clear that all statutory requirements for an agency relate to the agency's authority, and there is no meaningful distinction between jurisdictional versus nonjurisdictional statutory mandates. *See City of Arlington,* 133 S.Ct. at 1868-71; *see also Mach Mining*, 135 S.Ct. at 1651; *Leedom*, 358 U.S. at 190-91.

Second, the Board's actions were arbitrary and capricious because it applied the wrong legal standard, failed to articulate a reasoned explanation for its implied determination that §315(b) is not applicable, and its factual findings are not supported by substantial evidence. *See Daiichi*, 791 F.3d at 1379; *Japanese Found.*, 773 F.3d at 1304.

Third, at a minimum, the Court retains jurisdiction to review the decision below for critical legal errors and substantial procedural errors. *See, e.g.*, *Reilly*, 571 F.3d at 1378-79. In this case, the Board's errors amount to both. It is a critical legal error because the erroneous legal standard applied by the Board undermines the plain text and purpose of the "real parties in interest or privies" language in the statute, and would allow time-barred litigants to easily circumvent §315(b). Moreover, the Board's actions amounted to a substantial departure from important procedural rights protected by the Administrative Procedures Act, as previously discussed.

In the alternative, the Court should grant mandamus relief. To be entitled to mandamus, a party must show: (1) a clear an indisputable right to relief; (2) that the party lacks an adequate alternative means to obtain the relief; and (3) that the court should exercise its discretion to issue the writ of mandamus. *See In re Dominion Dealer Sols., LLC*, 749 F.3d 1379, 1381 (Fed. Cir. 2014).

First, Patent Owner has shown a clear and indisputable right to relief because the Board's §315(b) determination was so fundamentally flawed. The language and requirements of §315(b) are clear and unambiguous. Moreover, the Board's combination of errors make this a particularly compelling case for mandamus. The Board applied a fundamentally flawed legal test that undermines the clear intent of the statute; precluded patent owner from putting highly relevant evidence in the record; purposefully refused to consider the known indemnity agreements and other highly relevant evidence; and failed to articulate a reasoned basis for its actions. This satisfies the first requirement of mandamus.

Second, if the Court holds that the §315(b) issue is not reviewable by appeal, then Patent Owner lacks any alternative means for obtaining relief to correct the Board's errors, and mandamus relief is the Patent Owner's only available avenue for addressing the errors below.

Third, the Court should exercise its discretion to issue the writ. Failure to do so would allow the Board in this case to undermine the clear intent of a congressional mandate under §315(b), and would provide an easy path for time-barred parties to circumvent the rule. Patent Owner is unaware of any countervailing equitable considerations that should preclude the Court from issuing mandamus relief.

For the foregoing reasons, the Board's Final Written Decision should be reversed or vacated in light of the critical legal and procedural errors made by the Board in connection with its determination under 35 U.S.C. §315(b).

**B.**    **The Board's unpatentability determinations are erroneous and should be reversed.**

### 1.    Standard of Review

With respect to the Board's patentability determinations, the Court "review[s] the Board's conclusions of law de novo and its findings of fact for substantial evidence." *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1297 (Fed. Cir. 2015). The Board's claim constructions are reviewed *de novo*, whereas the underlying factual findings as to extrinsic evidence are reviewed for substantial evidence. *Teva Pharmaceuticals U.S.A., Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841–42 (2015). Substantial evidence is "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Consol. Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938).

> **2.     The Board erred in concluding that Hettich anticipates Claim 1 of the '625 Patent.**

The Board's determination that Hettich anticipates the challenged claim of the '625 Patent is not supported by substantial evidence and is legally erroneous. The Board concluded that the Delay PDU in Hettich commands a receiver "to receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet," and this "at least one packet" has a sequence number such as N+2, N+3, etc.  (A21.)  Yet after finding that the Delay PDU was separate and distinct from the "at least one packet" recited in claim 1, the Board switched course and relied on the Delay PDU as the "at least one packet" when analyzing the "releasing" and "discarding" limitations.  (A22–25.)  On the one hand, the Board recognized that the Delay PDU is *distinct from* the recited "at least one packet," but thereafter assumed that the Delay PDU *is* the "at least one packet."  Such inconsistent reasoning is contrary to Hettich, unsupported by any evidence, and is reversible error.

> **a.     Overview of Hettich**

Hettich discloses a design for a new link access protocol that "is based on known ARQ protocols and is adjusted to the special requirements of MBS [mobile

42

broadband systems]." (A802.)  Hettich implements an Adaptive Selective Repeat

(ASR) ARQ protocol based on the Selective Repeat ARQ Protocol.  (A827.)

Hettich discloses receivers having a "receive" window that maintains the sequence

numbers of cells to be accepted by the receiver.  (A826, eq. 5.7.)  To ensure that

cells have a finite life span, "[a] Delay Timer is set in the sender to control the

remaining lifecycle of the cells in the transmission window."  (A831.)  Hettich

further discloses that "[i]f the time expires, the cell is discarded."  (*Id*.)  The

receiver is unaware of any cells discarded by the transmitter unless and until the

receiver requests a discarded cell.  (*Id.*)

The "Delay PDU is used to inform receivers that cells have been discarded"

by the transmitter.  (*Id.*)  The Delay PDU "is only sent if the receiver requested a

discarded cell."  (*Id.*)  The Delay PDU represents the highest sequence number of

the continuous block of discarded cells in the transmitter.  (*Id.*)  Specifically,

Hettich discloses that "if the receiver receives a Delay PDU, it stops waiting for

cells where the following applies for the number:  $N \leq RN$," where RN "is the

highest number of the discarded cells," provided that "there cannot be valid (not

discarded cells) with lower sequence numbers."  (A831–32.)  The receiver "then

shifts the window and issues a corresponding acknowledgement."  (*Id.*)

43

### b.    The Board erred in concluding that Hettich teaches the "commanding a receiver to release" limitation.

Contrary to the Board's finding, a Delay PDU does not cause the receiver "to release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet," as required by claim 1.  After receiving a Delay PDU, the receiver in Hettich "stops waiting for cells where the following applies for the number:  $N \leq RN$" and "shifts the window."  (A832.)   Because a Delay PDU references the "highest number of all of the discarded cells" (A831), a Delay PDU merely releases expectations of receiving outstanding packets having sequence numbers equal to or less than the sequence number referenced in the Delay PDU, not packets having sequence numbers prior to the out of sequence packet as recited by claim 1.

Claim 1 requires, among other limitations, "releasing any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet."  A Delay PDU, in contrast, provides information about discarded cells; it provides no information about cells with sequence numbers higher than the sequence number referenced in the Delay PDU.  (A2136–37 at ¶57.)  Because a Delay PDU is silent about the expectations of packets having sequence numbers between the sequence number referenced in the Delay PDU and the sequence number of the next received packet, Hettich does not meet this limitation.

44

If the first cell received after receipt of a Delay PDU has a sequence number that is not sequential to the sequence number referenced in the Delay PDU (*i.e.,* the first cell received is out of order compared to the sequence number referenced by the Delay PDU), the receiver is either expecting or has received cells with sequence numbers between the discarded cells and that first received cell.  (A204 (sealed), A267 (redacted); A2139–40 at ¶62.)  "[A] packet that has been sent but not received or not correctly received" is an outstanding packet.  (A51 at 2:67–3:2.)  Cells that have not been received (or not correctly received)—outstanding cells—may exist between the discarded cells associated with a Delay PDU and that first received cell.  (A2139–40 at ¶62.)  And until such cells are received or identified as discarded, the receiver continues to expect to receive those cells.  Accordingly, Hettich does not "release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet."

The Board, however, inconsistently applied Hettich to claim 1.  The Board determined that in response to receipt of a Delay PDU, the "'Hettich[] receiver will accept a packet, such as N+2, N+3, that has a sequence number that is not consecutive with a sequence number of a previously received packet, as required by claim 1.'" (A21 (quoting A297; A831–32).)  The Board further stated that the out of sequence packet recited in claim 1 is the packet that is received *after* the

movement of the receiver window in response to the Delay PDU.  (A21 ("Patent Owner's argument that the receiver controls the packet reception because it moves its window forward is not persuasive because it does so in response to Hettich's Delay PDU sent by the transmitter.").)

Thus, the Board determined that the Delay PDU *is not* the recited "at least one packet," but instead causes the receiver to receive the "at least one packet." The Board found that, rather than the Delay PDU, the first packet received having a sequence number in the receive window is the "at least one packet" recited in claim 1.  In so finding, the Board distinguished between the Delay PDU (which shifted the receiver window) and the out of order packet (packet whose sequence number falls within the shifted receiver window, such as N+2, N+3.)  (A21.)

After determining that a Delay PDU command is not the received "at least one packet," the Board did an about face and assumed that the Delay PDU meets the "at least one" packet limitation.  According to the Board, "Hettich teaches that the Delay PDU—*i.e.*, the out of sequence packet—commands the receiver to release expectation of receiving packets having a sequence number lower than SN by instructing the receiver that cells with sequence numbers less than SN have been discarded."  (A23.)  This assumption is in conflict with its conclusion that the Delay PDU is *not* the "at least one packet."  The Board then concluded that the

"releasing" limitation is met by Hettich because the Delay PDU releases expectations of receiving outstanding packets having sequence numbers equal to or less than the sequence number referenced in the Delay PDU.  (A23.)  To reach its conclusion, the Board determined that the Delay PDU meets, and at the same time, does *not* meet the "at least one packet" limitation.

The Board's application is legally erroneous because the Delay PDU cannot meet the received out of sequence packet.  Hettich teaches the SN referenced in the Delay PDU is the largest sequence number of a block of contiguous cells that have been deleted:

> The Delay PDU is used to inform receivers that cells have been discarded.  It is only sent if the receiver requested a discarded cell (using RR or SREJ).  In this case, the Delay PDU is sent in the opposite direction instead of an acknowledgement and RN = SN, in which SN is the highest number of all of the discarded cells.

(A831.)  The SN in the Delay PDU is the "highest number of all discarded cells" and "is the most recently discarded cell." (*Id.*)  Accordingly, a request for a deleted cell in Hettich causes transmission of a Delay PDU referencing the largest sequence number of a block of contiguous cells.

The Board's analysis turns the disclosure of Hettich on its head.  The Board found that a Delay PDU meets the "at least one packet having a sequence number that is not consecutive with a sequence number of a received packet."  The Board

47

assumed that the sequence number referenced in a Delay PDU is the *actual* sequence number of the Delay PDU. But that finding belies Hettich's teaching that the sequence number referenced in a Delay PDU is the largest sequence number of a block of *deleted* cells. Because the Delay PDU is transmitted—and thus is not a deleted cell—the sequence number referenced in the Delay PDU cannot be the *actual* sequence number of the Delay PDU.

The Board's inconsistent findings are not supported by substantial evidence and prove that Hettich does not meet the "releasing" limitation. The Board ignored the "at least one packet" recited in the claim limitation, and therefore cannot show that Hettich discloses this limitation. Specifically, Hettich is silent about releasing expectations for packets having sequence numbers greater than the sequence number referenced in the Delay PDU and less the sequence number of the received out of order packet. Consequently, Hettich does not "release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet," as recited by claim 1.

### c.    The Board erred in concluding that Hettich teaches the "discarding unacknowledged packet" limitation.

The Board makes a similar fatal error in its analysis of the "discarding" limitation. Again, the Board assumed that the Delay PDU is the received out of order packet and determined that Hettich teaches that a "transmitter discards *all*

48

packets that have a sequence number prior to the Delay PDU." (A24 (emphasis in original).)  But as discussed in the previous section, the Delay PDU cannot be the "at least one packet" recited in claim 1.  The Board's finding as to the "discarding" limitation is not supported by substantial evidence.

Hettich is silent as to whether acknowledgement has been received for any of the non-discarded cells having sequence numbers between the sequence number referenced in the Delay PDU and the next received out of order packet.  (A2142 at ¶67.)  This is dispositive.  Indeed, non-discarded cells not correctly received by the receiver and having sequence numbers higher than the sequence number referenced by the Delay PDU have not been acknowledged.  (A2142 at ¶67.)  If the sequence number of the next packet received is out-of-order compared to the sequence number referenced in the Delay PDU, any unacknowledged packets have not been discarded by the transmitter.  (A2142 at ¶67.)  Accordingly, the transmitter in Hettich may contain one or more non-discarded cells for which acknowledgement has not been received, and which have sequence numbers prior to the first cell that the receiver received after reception of the Delay PDU. (A2142 at ¶67).  Consequently, Hettich does not teach the "discarding" limitation.

The Board misinterpreted Patent Owner's argument to support its contrary finding.  Patent Owner never conceded that SN may be the sequence number of the

49

Delay PDU itself. (A24.) There is no support for the position that the sequence number reference in the Delay PDU is the actual sequence number of the Delay PDU itself. Such a position belies the teachings of Hettich. Hettich teaches that a Delay DPU references the largest sequence number of a block of deleted cells. (A831 ("the Delay PDU is sent in the opposite direction instead of an acknowledgement and RN=SN, in which SN is the highest number of all of the discarded cells").) Assuming that the sequence number referenced in a Delay PDU is the actual sequence number of the Delay PDU packet itself, as does the Board, would render a Delay PDU as a deleted cell never to be transmitted. Because the Delay PDU is transmitted, not discarded, the sequence number referenced in the Delay PDU cannot be the actual sequence number of the Delay PDU itself. The Board's contrary finding is not supported by substantial evidence.

The "discarding" limitation requires the transmitter to "discard[] all packets for which acknowledgement has not been received, and which have sequence numbers prior to the at least one packet." Because Hettich is silent as to the status of outstanding packets—i.e., cells having sequence numbers between the sequence number referenced in a Delay PDU and the sequence number of the next received packet—Hettich does not teach or suggest the "discarding" limitation.

50

## CONCLUSION

For the foregoing reasons, the Board's Final Written Decision should be either reversed or vacated.

Dated:  October 26, 2015                    Respectfully submitted,


                                            */s/ Donald Puckett*
                                            G. Donald Puckett
                                            Steven Joseph Udick
                                            SKIERMONT PUCKETT LLP
                                            2200 Ross Avenue, Suite 4800W
                                            Dallas, Texas 75201
                                            (214) 978-6600 (telephone)
                                            (214) 978-6601 (facsimile)
                                            Donald.Puckett@skiermontpuckett.com
                                            Steve.Udick@skiermontpuckett.com

                                            Douglas A. Cawley
                                            MCKOOL SMITH, P.C.
                                            300 Crescent Court, Suite 1500
                                            Dallas, TX 75201
                                            (214) 978-4972 (telephone)
                                            (214) 978-4044 (facsimile)
                                            dcawley@mckoolsmith.com

                                            Peter J. Ayers
                                            LEE & HAYES PLLC
                                            11501 Alterra Parkway, Suite 450
                                            Austin, TX 78758
                                            (512) 605-0252 (telephone)
                                            (512) 605-0269 (facsimile)
                                            peter@leehayes.com

                                            Attorneys for Appellant,
                                            Wi-Fi One, LLC

51

# ADDENDUM

# <u>ADDENDUM TABLE OF CONTENTS</u>

A.    Final Written Decision 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73..........A001

B.    Decision on Request for Rehearing 37 C.F.R. § 42.71(d).....................A0324

C.    U.S. Patent No. US 6,424,625 B1 .........................................................A0038

Trials@uspto.gov                                         Paper 60
571-272-7822                              Entered:  March 6, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

BROADCOM CORPORATION,
Petitioner,

v.

WI-FI ONE, LLC,
Patent Owner.

_____

Case IPR2013-00636
Patent 6,424,625 B1

_____

Before KARL D. EASTHOM, KALYAN K. DESHPANDE, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges*.

CLEMENTS, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2013-00636
Patent 6,424,625 B1

## I.    INTRODUCTION

Broadcom Corporation ("Petitioner") filed a Petition requesting *inter partes* review of claim 1 of U.S. Patent No. 6,424,625 (Ex. 1001, "the '625 patent").  Paper 3 ("Pet.").  Telefonaktiebolaget L. M. Ericsson[1] ("Patent Owner") filed an election to waive its Preliminary Response.  Paper 19.  On March 10, 2014, we instituted an *inter partes* review of claim 1 on certain grounds of unpatentability alleged in the Petition.  Paper 25 ("Dec. to Inst.").

After institution of trial, Patent Owner filed a Patent Owner Response (Paper 34, "PO Resp.") and a Motion to Amend (Paper 36, "Mot. to Amend").  Petitioner filed a Reply (Paper 45, "Pet. Reply") and an Opposition to Patent Owner's Motion to Amend (Paper 44, "Opp. to Mot. to Amend").  Patent Owner filed a Reply to Petitioner's Opposition to its Motion to Amend.  Paper 47 ("PO Reply").  Oral hearing was held on December 8, 2014.[2]

The Board has jurisdiction under 35 U.S.C. § 6(c).  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Petitioner has shown, by a preponderance of the evidence, that claim 1 of the '625 patent is unpatentable.  Petitoner's Motion to Amend is *denied*.

---

[1] On July 11, 2014, Patent Owner filed an Updated Mandatory Notice indicating that the '215 patent had been assigned to Wi-Fi One, LLC, and that Wi-Fi One, LLC and PanOptis Patent Management, LLC were now the real parties-in-interest.  Paper 38.

[2] A transcript of the oral hearing is included in the record as Paper 59.

2

IPR2013-00636
Patent 6,424,625 B1

## A. Related Proceedings

Petitioner and Patent Owner indicate that the '625 patent is involved in a case captioned *Ericsson Inc. v. D-LINK Corp.,* Civil Action No. 6:10-cv-473 (E.D. Tex.) ("D-Link Lawsuit"). Pet. 1–2; Paper 6, 1. Patent Owner also identifies an appeal at the Federal Circuit captioned *Ericsson Inc. v. D-LINK Corp.*, Case Nos. 2013-1625, -1631, -1632, and -1633. Paper 6, 1. Petitioner also filed two petitions for *inter partes* review of related patents: IPR2013-00601 (U.S. Patent No. 6,772,215) and IPR2013-00602 (U.S. Patent No. 6,466,568). Pet. 2.

## B. The '625 patent

The '625 patent relates generally to Automatic Repeat Request (ARQ) techniques for transferring data in fixed/wireless data networks. Ex. 1001, 1:7–9. ARQ techniques commonly are used in data networks to ensure reliable data transfer and to protect data sequence integrity. *Id.* at 1:13–15. The integrity of data sequences normally is protected by sequentially numbering packets and applying certain transmission rules. *Id.* at 1:20–22. By doing so, the receiver receiving the packets can detect lost packets and thereby request that the transmitter retransmit the affected data packets. *Id.* at 1:15–20. According to the '625 patent, there were three main ARQ schemes: Stop-and-Wait; Go-Back-N; and Selective Reject. *Id.* at 1:23–25. All three provide a mechanism for transferring packets to a receiver in a data network in an appropriate order. *Id.* at 1:25–27.

Normally, it is desirable to transfer all packets without data loss. *Id.* at 3:46–47. Sometimes, however, sending significantly

3

IPR2013-00636
Patent 6,424,625 B1

delayed packets provides no benefit—e.g., where the delay causes the information in the packets to become outdated and therefore useless to the receiver. *Id.* at 3:47–51. Examples of delay-sensitive applications are, e.g., telephony, video conferencing, and delay-sensitive control systems. *Id.* at 3:51–53. According to the '625 patent, prior art ARQ methods did not recognize and allow for situations where data packets have a limited lifetime, and therefore, fail to minimize bandwidth usage by not sending (or resending) significantly delayed or outdated data packets. *Id.* at 4:9–13.

To address these issues, the '625 patent discloses an ARQ technique that minimizes bandwidth usage by accounting for data packets that have an arbitrary but limited lifetime. *Id.* at 4:16–19. Exemplary embodiments of the invention include enhanced "Go-Back-N" and "Selective Reject" techniques that discard outdated data packets. *Id.* at 4:21–25. In an exemplary embodiment of the invention, the progress of a bottom part of a sender window of the transmitter is reported to the receiver in order to allow the receiver to properly skip packets which do not exist anymore because they have been discarded. *Id.* at 5:15–21. Thus, the receiver can be commanded to skip or overlook the packets that have been discarded or, in other words, to release any expectation of receiving the packets that have been discarded. *Id.* at 5:22–27. In the case where the transmitter discards a packet, it orders the receiver to accept the next packet by setting a Receiver Packet Enforcement Bit ("RPEB") in the ARQ header of the next packet and sending the packet to the receiver. *Id.* at

4

IPR2013-00636
Patent 6,424,625 B1

5:28–32.  When the receiver receives the packet, the RPEB will cause the receiver to accept the packet.  *Id.* at 5:32–33.

Figure 8 is reproduced below.



FIG. 8

Figure 8 shows ARQ packet 810 with ARQ header 812 and data portion 818.  *Id.* at 5:33–35.  Header 812 includes RPEB 814 and k-bit sequence number N(S) 816.  *Id.* at 5:35–37.  RPEB 814 may be used in a variety of situations.  *Id.* at 5:41–43.  For example, if a NACK is sent by a receiver, received by the transmitter, and is valid for one discarded data packet, then the next data packet to be retransmitted can have RPEB set to TRUE.  *Id.* at 5:43–48.  In another example, if a retransmission timer expires and one or more data packets have been discarded, the next incoming data packet to be transmitted (or the first data packet to be retransmitted) can have RPEB set to TRUE.  *Id.* at 5:49–53.  If RPEB is TRUE and the difference between the sequence number and the Expected Sequence Number (ESN) of the next packet to be received is less than the window size (i.e., half the maximum sequence number), the packet will be accepted and forwarded to a higher layer (as long as the data in the packet is also correct).  *Id.* at 5:62–63, 6:32–36.  In this way, the various embodiments of the invention increase throughput of a communications system using ARQ packets by discarding outdated packets.  *Id.* at 9:60–62.

IPR2013-00636
Patent 6,424,625 B1

*C. Illustrative Claim*

Claim 1, the sole challenged claim, is reproduced below:

1.    A method for discarding packets in a data network employing a packet transfer protocol including an automatic repeat request scheme, comprising the steps of:

a transmitter in the data network commanding a receiver in the data network to a) receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet and b) release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet; and

the transmitter discarding all packets for which acknowledgment has not been received, and which have sequence numbers prior to the at least one packet.

*D. Prior Art Supporting the Instituted Grounds*

The following prior art was asserted in the instituted grounds:

| | | | |
|---|---|---|---|
| Garrabrant | US 5,610,595 | Mar. 11, 1997 | Ex. 1002 |
| Andreas Hettich, "Development and performance evaluation of a Selective Repeat-Automatic Repeat Request (SR-ARQ) protocol for transparent, mobile ATM access" (April 17, 1996) (diploma paper, Aachen Tech. University)("Hettich") | | | Ex. 1003 |
| Walke | DE 19543280 | May 22, 1997 | Ex. 1004 |
| Hettich (English language translation)[3] | | | Ex. 1007 |
| Walke | DE 19543280 (English translation)[4] | May 22, 1997 | Ex. 1008 |

---

[3] All references in this decision to "Hettich" are to the English translation (Ex. 1007) of the German thesis.

[4] All references in this decision to "Walke" are to the English translation (Ex. 1008) of the German patent publication.

IPR2013-00636
Patent 6,424,625 B1

*E. The Instituted Grounds of Unpatentability*

The following table summarizes the challenges to patentability on which we instituted *inter partes* review:

| Reference | Basis |
|-----------|-------|
| Garrabrant | § 102 |
| Hettich | § 102 |
| Walke | § 103 |

## II.   ANALYSIS

*A.  35 U.S.C. § 315(b)*

Patent Owner argues that "Petitioner is subject to the 35 U.S.C. § 315(b) bar as a privy to the D-Link Defendants, and because the D-Link Defendants are real parties-in-interest to this action, despite Petitioner's failure to designate them as such under 35 U.S.C. § 312(a)(2)."  PO Resp. 8–9.  According to Patent Owner, Petitioner is in privity with defendants named in the D-Link Lawsuit (*Ericsson Inc. v. D-Link Corp.*, 6:10-cv-473) because, *inter alia*, "[Petitioner] has an indemnity relationship with Dell and Toshiba."  *Id.* at 9–12.  Patent Owner also argues that the defendants named in the D-Link Lawsuit (the "D-Link Defendants") are real parties-in-interest to this proceeding because Petitioner has a "substantive legal relationship with at least Dell and Toshiba," Petitioner used the same prior art references as the D-Link Defendants, and the Petition was filed after the D-Link Defendants abandoned their invalidity case regarding the '625 patent in the D-Link Lawsuit.  *Id.* at 12–15.

7

IPR2013-00636
Patent 6,424,625 B1

Petitioner counters that "[Patent] Owner has raised this identical argument twice, and failed each time," and that "[t]his third attempt relies on exactly the same arguments [Patent] Owner made to this Board and the Federal Circuit and should be rejected for the same reasons." Pet. Reply 1. Petitioner continues that, "[Patent] Owner offers no new reason whatsoever for this Board to reverse its prior decision that [Patent] Owner's preferred 'evidence' and legal authorities fail to amount to anything more than 'speculation' or 'a mere possibility' that [Petitioner] is in privity with the D-Link Defendants or that the D-Link Defendants are real parties-in-interest." *Id.* We find Petitioner's arguments persuasive.

Patent Owner's arguments and evidence are not different substantively from the arguments and evidence presented in its Motion for Additional Discovery (Paper 11). The arguments and evidence are unpersuasive for same reasons explained in our Decision on Patent Owner's Motion for Additional Discovery (Paper 20), which we adopt and incorporate by reference.

### B. Claim Construction

In an *inter partes* review, claim terms in an unexpired patent are interpreted according to their broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b); *see also In re Cuozzo Speed Technologies, LLC*, No. 2014-1301, 2015 WL 448667, at *5–*8 (Fed. Cir. Feb. 4, 2015) ("Congress implicitly adopted the broadest reasonable interpretation standard in enacting the AIA," and "the standard was properly adopted by PTO regulation."). Under the broadest reasonable

8

**A0008**

IPR2013-00636
Patent 6,424,625 B1

interpretation standard, claim terms are given their ordinary and customary meaning as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).  An inventor may rebut that presumption by providing a definition of the term in the specification with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).  In the absence of such a definition, limitations are not to be read from the specification into the claims. *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

### 1. Preamble

Petitioner proposes that the preamble of claim 1 should not be construed to limit claim 1.  Pet. 17–18.  Specifically, Petitioner argues that the terms used in the preamble are not later referred to or necessary to understand the body of claim 1, and that the preamble merely states the purpose or intended use of the invention.  *Id.* at 17. Petitioner further argues that, during prosecution of the '625 patent, the Patent Owner did not rely on the preamble to distinguish the prior art.  *Id.* at 18.

"In general, a preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)).

IPR2013-00636
Patent 6,424,625 B1

On this record, because claim 1 defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention, we agree that the preamble does not limit claim 1.

### 2.  *"commanding"*

Petitioner argues that "commanding" should be construed to mean "an instruction represented in a control field to cause an addressed device to execute a specific control function."  Pet. 18–19 (emphasis and internal quotation marks omitted).  Petitioner's proposed construction is similar to the definition of "command" from the *IEEE Dictionary*.  Pet. 19 n.3 (citing Ex. 1011, 214–215). Petitioner argues that this construction is consistent with the claims and specification of the '625 patent, which describes the commanding step being carried out by an enforcement bit ("RBEP bit").  *Id.* (citing Ex. 1001, Abstract, claim 3).  Petitioner argues that the definition proposed by Patent Owner in the Texas Litigation was overly broad because one of ordinary skill would not understand a packet to be a command to receive simply because the receiver receives it.  Pet. 19– 20 (citing Ex. 1006 ¶ 38).

The '625 patent states that, "the receiver can be *commanded* to skip or overlook the packets which have been discarded, or in other words, to release any expectation of receiving the packets which have been discarded."  Ex. 1001, 5:22–25 (emphasis added).  The '625 patent further explains that, "[i]n the case where the transmitter discards a packet, it orders the receiver to accept the next packet, by setting a certain Receiver Packet Enforcement Bit (RPEB) in the ARQ

IPR2013-00636
Patent 6,424,625 B1

header of the next packet and sending the packet to the receiver." *Id.* at 5:28–32. The result is that, "[w]hen the receiver receives the packet, the RPEB bit will cause the receiver to accept the packet." *Id.* at 5:32–33. Thus, not every received packet "commands" the receiver to perform the rest of the claimed limitation; only a packet whose RPEB bit is set "commands" the receiver to do so. Moreover, Petitioner's proposed construction is consistent with how a person of ordinary skill in the art would have understood the term at the time that the '625 patent was filed. *See* Ex. 1011, 214–215. Accordingly, in the Decision to Institute, we construed "commanding" to mean "an instruction represented in a control field to cause an addressed device to execute a specific control function." Dec. to Inst. 8–9.

Patent Owner argues that this construction "does not represent the broadest reasonable construction" (PO Resp. 19) because it "improperly imports limitations from the specification" by reciting "represented in a control field" (*Id.* at 20). According to Patent Owner, the broadest reasonable interpretation of "commanding" is "exercising a dominating influence." *Id.* at 19–20.

Patent Owner's proposed construction relies heavily on extrinsic evidence in the form of a definition from http://www.merriam-webster.com. Patent Owner does not even attempt to establish that this definition is contemporaneous with the effective filing date of the '625 patent. Nevertheless, to the extent that "an instruction represented in a control field" incorporates a limitation from the Specification, we modify our construction to clarify that the command need not be in any particular format, such as the RPEB bit

11

**A0011**

IPR2013-00636
Patent 6,424,625 B1

of the preferred embodiment; it need only cause an addressed device
to execute a specific control function.  Accordingly, we construe
"commanding" to mean "causing an addressed device to execute a
specific control function."

### C. Claim 1 – Anticipation by Garrabrant

Petitioner argues that claim 1 is unpatentable under 35 U.S.C.
§ 102(b) as anticipated by Garrabrant.  Pet. 28–37.  In support of this
ground of unpatentability, Petitioner provides detailed explanations as
to how each claim limitation is disclosed by Garrabrant, and relies
upon the Declaration of Dr. Harry Bims (Ex. 1006).  *Id.* (citing Ex.
1006 ¶¶ 47–70).

Patent Owner argues that claim 1 is not anticipated by
Garrabrant because Garrabrant does not disclose (1) "commanding a
receiver to . . . receive," as recited in claim 1; (2) "commanding a
receiver to . . . release," as recited in claim 1; and (3) "discarding all
packets for which acknowledgment has not been received, and which
have sequence numbers prior to the at least one packet," as recited in
claim 1.  PO Resp. 20–37.

Upon consideration of the parties' contentions and supporting
evidence, we determine that Petitioner has not demonstrated, by a
preponderance of the evidence, that claim 1 is anticipated by
Garrabrant.

#### *Garrabrant (Exhibit 1002)*

Garrabrant describes a method and apparatus for transmitting
data in a packet radio communication system having data sources,
destinations, and intermediate repeaters.  Ex. 1002, Abstract.

12

**A0012**

IPR2013-00636
Patent 6,424,625 B1

According to a packet protocol, a sequence index is used to prevent duplicate packets from being received by requiring that the sequence number fall within a sequence number window at each device. *Id.* The sequence number window is incremented each time a packet is received. *Id.* The sequence number also is used to cause the retransmission of packets that are lost, at which time the sequence number window in the devices that are affected are reset to allow transmission of the lost packet. *Id.*

Figure 7A is reproduced below.



*Fig. 7A*

Figure 7A illustrates a window used with the packet radio communication system of the '625 patent according to the protocol of the '625 patent before the transmission of a message. *Id.* at 9:9–13. The window has circle 140 with sequence numbers on the circumference of the circle representing the possible values that can be contained in a set of possible sequence numbers. *Id.* at 9:13–16. Some predetermined fraction of the set of possible sequence numbers constitutes the set of sequence numbers in "valid" window 142, and

13

IPR2013-00636
Patent 6,424,625 B1

the set of remaining possible sequence numbers constitutes the set of sequence numbers in "rejection" window 144. *Id.* at 9:20–24.

When the message source does not receive a response ("UA") acknowledging receipt of the transmitted message, the message is retransmitted for a certain predetermined number of times. *Id.* at 10:4–8. A source unit and a destination unit will allow as many messages as there are in "valid" window 142 to become lost while still maintaining synchronization. *Id.* at 10:15–17.

Figures 8A and 8B, reproduced below, show what happens if five packets are lost. *Id.* at 10:17–18.



*Fig. 8A*    *Fig. 8B*

Figure 8A illustrates rejection window 160 in circle set of acceptable sequence numbers 162 at a destination unit of the packet radio communication system *before* the rejection window is updated in response to the receipt of a "lost" message. *Id.* at 10:18–24. Figure 8B illustrates rejection window 170 in circle set of acceptable sequence numbers 172 at the destination unit *after* the rejection window is updated in response to the receipt of a "lost" message. *Id.* at 10:24–28. In Figure 8A, it is assumed that out of 8 packets sent,

14

**A0014**

IPR2013-00636
Patent 6,424,625 B1

packets 0 and 1 were successfully received to define "valid" window 164 and packets 2 through 6 were lost. *Id.* at 10:28–30. As a result, "valid" window 164 did not advance further. *Id.* at 10:30–32. Each time a packet was transmitted, the sender unit incremented its sequence count. *Id.* at 10:32–34. However, because these packets were lost, the destination unit did not receive them and "valid" window 164 is still set between 2 and 17. *Id.* at 10:34–37. When packet 7 eventually arrives at the destination unit, it falls within "valid" window 164 and is accepted by the destination unit. *Id.* at 10:37–39. The destination unit then sets its internal sequence count to 8 as shown in Figure 8B and slides its "valid" window 164 to the position of "valid" window 174, shown in Figure 8B, to allow packets 8 through 23. *Id.* at 10:39–42.

> *Analysis*

> Independent claim 1 recites

> a transmitter in the data network commanding a receiver in the data network to a) receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet and b) release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet.

Petitioner relies upon Garrabrant's disclosure of sending a "lost" message that instructs the receiver to move its window forward upon receipt of the next received packet. Pet. 31 (citing Ex. 1002, Figs. 8A, 8B, 10:14–42). In the example illustrated in Figures 8A and 8B, the "lost" message instructs the receiver to receive a packet (packet 7) having a sequence number that is not consecutive with a sequence number of a previously received packet (packets 0 and 1), and release

15

**A0015**

IPR2013-00636
Patent 6,424,625 B1

any expectation of receiving outstanding packets having sequence
numbers prior to the at least one packet (i.e., moving "valid" window
forward to allow packets 8 through 23, thereby giving up on packets 2
through 5). *Id.*

> Patent Owner argues as follows:

> A "lost" message is not a unique command (or even a command
> for that matter); a "lost" message that is received by a receiver
> is no different from, nor treated differently from any other
> message (or packet) received by the receiver—that is why
> Garrabrant puts that term in quotes. (*See id.* at 10:18-28 ("a
> 'lost' message").)  Upon receipt of a message, the Garrabrant
> receiver adjusts its valid window (and concomitantly the
> rejection window) based upon the sequence number of every
> received message—whether that received message is a "lost"
> message or one received in sequence.

PO Resp. 26.  According to Patent Owner, "[a]n analysis of Figs. 8A
and 8B shows that the 'lost' message disclosed in Garrabrant does not
command the receiver to accept anything, let alone a packet." *Id.* at
28.  Although Garrabrant describes Figure 8B as representing the
rejection window after it is updated in response to receipt of "a 'lost'
message" (Ex. 1002, 10:24–28), Patent Owner argues that the "lost"
message referred to is actually packet 7.  PO Resp. 29 (citing 1002,
10:37–42).  Patent Owner also argues that if the "lost" message were a
command, it would be listed in Garrabrant's two tables of commands,
which it is not. *Id.* at 24–25.

Petitioner counters that Garrabrant's description of "a 'lost'
message" refers to "a control message *named* 'lost.'"  Pet. Reply 7.
Petitioner emphasizes Garrabrant's disclosure that "the rejection
window [is] updated in response to the receipt of a 'lost' message."

16

**A0016**

IPR2013-00636
Patent 6,424,625 B1

*Id.* With respect to the tables of commands, Petitioner argues that "Garrabrant never states that the messages in the tables are the 'only' commands allowed" and that "Garrabrant never excludes other commands from being present." *Id.* at 8. Petitioner concludes that "[Patent] Owner's argument does not preclude either of these types of command messages from transmitting the 'lost' message." *Id.* at 9.

In light of the arguments and evidence, we are not persuaded that Petitioner has demonstrated, by a preponderance of the evidence, that Garrabrant discloses a control message named "lost." Garrabrant describes the rejection window in Figure 8B as having been "updated in response to the receipt of a 'lost' message." Ex. 1002, 10:24–28. Later in the same paragraph, however, Garrabrant states explicitly that valid window 174 is updated "[w]hen packet 7 eventually arrives . . . and is accepted by the destination unit." *Id.* at 10:37–42. Together, the two sentences imply that packet 7 is the "lost" message referred to at column 10, line 28. Garrabrant, however, describes only packets 2 through 6—not packet 7—as lost (*Id.* at 10:30), which implies that packet 7 is not a "lost" message. We note, however, that Garrabrant describes packets 2 through 6 as lost (without quotes). *Id.* at (10:28– 30 ("In FIG. 8A it is assumed that out of 8 packets sent, packets 0 and 1 were successfully received to define the "valid" window 164 and packets 2 through 6 were lost."). We, therefore, interpret Garrabrant's use of lost (without quotes) to mean truly lost (i.e., never received by the receiver), and its use of "lost" (with quotes) to mean transmitted but not yet received, as packet 7 is at the time depicted in Figure 8A. As a result, we agree with Patent Owner that Garrabrant discloses

17

IPR2013-00636
Patent 6,424,625 B1

updating the window in response to packet 7, and does not disclose a separate control message named "lost."  Because we are not persuaded that Garrabrant discloses a control message named "lost," we are not persuaded that Garrabrant discloses "causing an addressed device to execute a specific control function," as required by our construction of "commanding."

Our determination is supported by the fact that Petitioner's contention that a separate "lost" message is received before packet 7 is inconsistent with the disclosure in Garrabrant.  If we were to accept Petitioner's contention that the described "lost" message is a separate control message that updates the valid window as shown in Figure 8B, then valid window 174 shown in Figure 8B would be set to allow only packets 8 through 23 before packet 7 arrived and, therefore, packet 7 would not be "accepted by the destination unit" when it "eventually arrives," as Garrabrant states.  Ex. 1002, Fig. 8B, 10:39–42.  Casting further doubt upon Petitioner's contention that the described "lost" message is a control message is the omission of any such message from the tables of commands disclosed in Garrabrant.  *Id.* at 6:5–45.

<u>Conclusion</u>

We are not persuaded that Petitioner has demonstrated, by a preponderance of the evidence, that claim 1 is unpatentable as anticipated by Garrabrant.

### D. Claim 1 – Anticipation by Hettich

Petitioner argues that claim 1 is unpatentable under 35 U.S.C. § 102(b) as anticipated by Hettich.  Pet. 37–41.  In support of this ground of unpatentability, Petitioner provides detailed explanations as

18

**A0018**

IPR2013-00636
Patent 6,424,625 B1

to how each claim limitation is disclosed by Hettich, and relies upon the Declaration of Dr. Bims (Ex. 1006). *Id.* (citing Ex. 1006 ¶¶ 79–90).

Patent Owner argues that claim 1 is not anticipated by Hettich because Hettich does not disclose (1) "commanding a receiver to . . . receive," as recited in claim 1; (2) "commanding a receiver to . . . release," as recited in claim 1; and (3) "discarding all packets for which acknowledgment has not been received, and which have sequence numbers prior to the at least one packet," as recited in claim 1. PO Resp. 37–46.

Upon consideration of the parties' contentions and supporting evidence, we determine that Petitioner has demonstrated, by a preponderance of the evidence, that claim 1 is anticipated by Hettich.

### *Hettich (Exhibit 1007)*

Hettich describes a new link access protocol based on known ARQ protocols and adjusted for the special requirements of the Mobile Broadband System ("MBS") project. Ex. 1007, 4–5. Specifically, Hettich discloses an Adaptive Selective Repeat ("ASR") ARQ protocol that is a modified Selective Reject ("SR") ARQ and uses a Selective Reject (SREJ) PDU to request an individual frame again. *Id.* at 29–30. Hettich further discloses a Delay PDU that "is used to inform receivers that cells have been discarded." *Id.* at 34. The Delay PDU "is sent in the opposite direction instead of an acknowledgement"—i.e., from transmitter to receiver—and has RN (the lowest frame number that has not been received correctly yet) set equal to SN, where SN is the highest number of all of the discarded

19

IPR2013-00636
Patent 6,424,625 B1

cells.  *Id.* at 28, 34.  If the receiver receives a Delay PDU, it stops waiting for cells with sequence numbers less than or equal to RN.  *Id.* at 35.  The receiver then shifts its window and issues a corresponding acknowledgement.  *Id.*

*Analysis*

Independent claim 1 recites

> a transmitter in the data network commanding a receiver in the data network to a) receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet and b) release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet.

Petitioner relies upon Hettich's disclosure of a Delay PDU that commands a receiver to shift its window, thereby releasing any expectation of receiving packets having sequence numbers less than or equal to SN and allowing the receiver to receive packets with sequence numbers greater than SN.  Pet. 34–35.

Claim 1 also recites "the transmitter discarding all packets for which acknowledgment has not been received, and which have sequence numbers prior to the at least one packet."  Petitioner relies upon Hettich's disclosure that the transmitter sets RN=SN in the Delay PDU, where "*SN* is the highest number of all the discarded cells," and "there cannot be valid (not discarded) cells with lower sequence numbers."  *Id.* at 34.  Thus, the transmitter discards all packets with sequence numbers below SN.

We are persuaded that the evidence cited by Petitioner supports Petitioner's contentions.  Patent Owner presents several arguments as to why Hettich does not teach all of the limitations of the claims.  PO

20

IPR2013-00636
Patent 6,424,625 B1

Resp. 37–46.  Petitioner responds to these arguments.  Pet. Reply 11–13.  We address each argument in turn below.

### *"commanding a receiver to receive"*

Patent Owner argues that, "the Delay PDU causes Hettich's receiver to 'stop[] waiting for cells,'" but "does not 'command' or 'order' the receiver to accept any packet, as required by the claim language."  PO Resp. 39.  According to Patent Owner, "[t]hat the receiver moves its window forward to allow it 'to receive a packet after SN' shows that the receiver, not the transmitter controls packet reception."

Petitioner counters that "claim 1 does not require identifying a specific sequence number.  Nor does it require that the next received packet have that specific sequence number.  Claim 1 only requires that there be a command to receive 'at least one packet,' which in Hettich are sequence numbers to N+1, N+2, N+3, etc."  Pet. Reply 11.

We find Petitioner's arguments persuasive.  Receipt of a Delay PDU causes Hettich's receiver to "shift[] the window."  Ex. 1007, 35.  As a result of that shift, Hettich's receiver will accept a packet, such as N+2 or N+3, that has "a sequence number that is not consecutive with a sequence number of a previously received packet," as required by claim 1.  Pet. Reply 11; Ex. 1007, 35–36.  Patent Owner's argument that the receiver controls packet reception because it moves its window forward is not persuasive because it does so in response to Hettich's Delay PDU sent by the transmitter.

21

IPR2013-00636
Patent 6,424,625 B1

*"commanding a receiver to release"*

Patent Owner argues that "a Delay PDU does not command a receiver to release expectations of receiving outstanding packets having a sequence number *prior to* a received out of sequence packet" because it "merely release[s] expectation of receiving outstanding packets having sequence numbers equal to or less than the sequence number of the Delay PDU, not packets having sequence numbers prior to the out of sequence packet." PO Resp. 40. Patent Owner argues that, in Hettich, it is possible for the next packet received by the receiver to have a non-sequential SN. *Id.* at 40–41. Patent Owner then acknowledges that the next packet received by the receiver could be sequential, but argues that a person of ordinary skill in the art would not expect it to be. *Id.* at 41–42.

Petitioner counters that Hettich's "transmitter would be able to send the DELAY N command and then send packet N+1 next, and this would be readily understood." Pet. Reply 12. Petitioner also argues that, "[a]t a minimum, Hettich implicitly discloses (and certainly does not exclude) sending N+1 as the next packet." *Id.* Finally, Petitioner argues that "claim 1 does not require the next packet actually sent to have any particular sequence number, only that the receiver be ready to receive 'at least one packet' not consecutive with a previously received packet (such as N+1) and release expectations of receiving prior packets (such as N, N-1, etc.)." *Id.*

Although this limitation is amenable to two interpretations, we find Petitioner's arguments persuasive under both. To the extent that this limitation is construed to require releasing expectation of *all*

22

**A0022**

IPR2013-00636
Patent 6,424,625 B1

packets having a sequence number prior to the received out of sequent packet, Hettich teaches that the Delay PDU—*i.e.,* the out of sequence packet—commands the receiver to release expectation of receiving packets having a sequence number lower than SN by instructing the receiver that cells with sequence numbers less than SN have been discarded. Ex. 1007, 34. Patent Owner concedes that the Delay PDU "release[s] expectation of receiving outstanding packets having sequence numbers *equal to or less than* the sequence number of the Delay PDU." PO Resp. 40 (emphasis added). Thus, when SN is equal to the sequence number of the Delay PDU, the receiver "release[s] any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet [i.e., the Delay PDU]," as recited in claim 1. Ex. 1007, 34–36. To the extent that this limitation is construed to require releasing expectation of receiving *at least some* outstanding packets, Hettich's Delay PDU does so when SN is less than the sequence number of the Delay PDU. *Id.*

With respect to whether the next packet would be sequential, claim 1 does not require that the next received packet have a particular sequence number. It requires only that that packet's sequence number "is not consecutive with a sequence number of a previously received packet." As a result, Patent Owner's arguments are not persuasive because they are not commensurate with the limitations of the claim.

### *Discarding unacknowledged packets*

Patent Owner argues that, "Hettich is silent as to whether acknowledgment has been received for any of the non-discarded cells having sequence numbers between the Delay PDU and the next

23

**A0023**

IPR2013-00636
Patent 6,424,625 B1

received out of order packet." PO Resp. 43. According to Patent Owner, "the transmitter in Hettich may contain one or more non-discarded cells for which acknowledgement has not been received, and which have sequence numbers prior to the first cell that the receiver received after reception of the Delay PDU." *Id.*

Petitioner counters that "[w]hile possible, it is understood that the transmitter could send DELAY N and then send packet N+1." Pet. Reply 13. According to Petitioner, "as long as the transmitter discards packets meeting the conditions of claim 1, claim 1 is met whether or not the transmitter discards other packets." *Id.*

We find Petitioner's arguments to be persuasive. Hettich discloses that the "[t]he Delay PDU is used to inform receivers that cells have been discarded." Ex. 1007, 34. "SN is the highest number of all of the discarded cells." *Id.* Thus, Hettich discloses that the transmitter discards all packets having sequence numbers less than or equal to SN. Patent Owner concedes that SN may be the sequence number of the Delay PDU itself. PO Resp. 40 (the Delay PDU "release[s] expectation of receiving outstanding packets having sequence numbers *equal to or less than* the sequence number of the Delay PDU." (emphasis added)). Thus, Hettich discloses "discarding all packets . . . which have sequence numbers prior to the at least one packet [i.e., the Delay PDU]" because the transmitter discards *all* packets that have a sequence number prior to the Delay PDU. It discards all packets that have a sequence number prior to the Delay PDU, including, *inter alia*, those "for which acknowledgement has not

IPR2013-00636
Patent 6,424,625 B1

been received," as required by claim 1.  Thus, we are persuaded that
Hettich discloses the limitation.

### Conclusion

We determine that Petitioner has established, by a
preponderance of evidence, that Hettich anticipates claim 1.

### E.  Claim 1 – Obviousness over Walke

Petitioner argues that claim 1 is unpatentable under 35 U.S.C.
§ 103(a) as obvious over Adams.  Pet. 41–47.  In support of this
ground of unpatentability, Petitioner provides detailed explanations as
to how each claim limitation is taught or suggested by Walke, and
relies upon the Declaration of Dr. Bims.  *Id*. (citing Ex. 1006 ¶¶ 91–
99).

Patent Owner argues that claim 1 is not obvious over Walke
because Walke does not disclose (1) "commanding a receiver to . . .
receive," as recited in claim 1; (2) "commanding a receiver to . . .
release," as recited in claim 1; and (3) "discarding all packets for
which acknowledgment has not been received, and which have
sequence numbers prior to the at least one packet," as recited in claim
1.  PO Resp. 46–54.

Upon consideration of the parties' contentions and supporting
evidence, we determine that Petitioner has not demonstrated, by a
preponderance of the evidence, that claim 1 is obvious over Walke.

### Walke (Exhibit 1008)

Walke describes a mobile communication system in which
Asynchronous Transfer Mode ("ATM") network cells can be
transmitted via a radio interface with a quality of service comparable

25

**A0025**

IPR2013-00636
Patent 6,424,625 B1

to that achieved ordinarily by a fixed network of similar capacity.  Ex. 1008, col. 3.  Walke discloses "specific measures to ensure that the required connection-specific quality of service parameters 'maximum ATM cell-loss rate' and 'maximum ATM cell delay' are complied with," namely, "error-correction processes involving automatic repeat request (ARQ) processes."  *Id.*  The error correction process according to the invention uses an improved selective repeat (SR) algorithm by using a Selective Reject (SREJ) order to request retransmission of individual ATM cells.  *Id.* at col. 11.  In one embodiment of the error correction process, the sending station can reject ATM cells that have exceeded their maximum permitted delay.  If a receiver issues a retransmission request for an ATM cell, but the cell reaches its maximum delay in the meantime, the sender rejects the ATM cell.  *Id.* at col. 12.  The sender informs the receiver that this ATM cell will not be retransmitted by using a delay order, which is treated as an acknowledgement, but is generated by the sender and sent to the receiver.  *Id.* at cols. 12–13.  The receipt sequence number N(R) in this command is set to the sequence number of the rejected ATM cell. *Id.*  The delay command is piggybacked by an N frame and, as a result, the N frame becomes a delay frame.  *Id.*

Figure 9 of Walke is reproduced below.

26

IPR2013-00636
Patent 6,424,625 B1



FIG. 9: Treatment of rejected ATM cells

Figure 9 shows an exemplary protocol sequence showing the treatment of outdated ATM cells. *Id.* at cols. 12–13. ATM cell RR(0, X) is received correctly. *Id.* ATM cell RR(1, X) is not received correctly. ATM cell RR(2, X) is received correctly. *Id.* The receiver sends a selective reject message SREJ(X, 1) indicating that ATM cell RR(1, X) was not received. *Id.* The transmitter decides to discard ATM cell RR(1, X) so it sends DELAY(4, 1) to the receiver. The DELAY message "tells the receiver not to wait for anything else on frame 1 and it is able to widen its receive window." *Id.* at col. 13.

> *Analysis*
>
> Independent claim 1 recites
>
> a transmitter in the data network commanding a receiver in the data network to a) receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet and b) release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet.

27

IPR2013-00636
Patent 6,424,625 B1

Petitioner relies upon Walke's teaching of a DELAY message that instructs the receiver to receive a packet (i.e., packet #4 in the example of Figure 9) and release expectation of receiving an outstanding packet (i.e., packet #1 in the example of Figure 9) having a sequence number prior to the at least one packet. Pet. 44–46 (citing Ex. 1008, cols. 12–13 (Section 2.6)). Petitioner provides an example and acknowledges that, "[i]n this example . . . the DELAY (4,1) message causes the receiver to release packet #1, but not packets #2 and #3 (and thus not 'all packets . . . [that] have sequence numbers prior to the at least one packet' as recited in Claim 1 of the '625 patent)." Pet. 44. Petitioner argues, however, that one of ordinary skill in the art would understand that Walke discloses the claimed method under certain conditions—i.e., where the DELAY message is DELAY(n, n-1). Pet. 44–45, 47.

Patent Owner argues that "Walke does not disclose a receiver releasing any expectation of receiving outstanding packets because the Walke Delay message addresses only a single packet." PO Resp. 49. According to Patent Owner, "[i]f multiple outstanding packets having sequence numbers between the discarded packet identified by the Delay message and the first received message exist, the Delay message would not have released any expectation of receiving those outstanding packets." *Id.*

Petitioner counters that Walke performs the method in certain circumstances and that, "a method claim is anticipated whenever the method is performed, no matter how frequently." Pet. Reply 14 ("For example, when Delay (4, 3) is sent and only packet #3 is outstanding,

IPR2013-00636
Patent 6,424,625 B1

the method of releasing expectation of receiving "all" outstanding packets below #4 (*i.e.*, #3) is met.").

We are persuaded by Patent Owner's argument. Because Walke's DELAY message identifies only a single packet, it is a command to release any expectation of receiving only one packet having a particular sequence number, not a command "release any expectation of receiving outstanding *packets* [plural] having sequence numbers prior to the at least one packet," as required by claim 1 (emphasis added).

### *Conclusion*

We are persuaded that Petitioner has not demonstrated, by a preponderance of the evidence, that claim 1 is unpatentable as obvious over Walke.

### *F. Patent Owner's Motion to Amend*

Patent Owner moves to substitute claim 20 for challenged claim 1 if we find claim 1 unpatentable. Mot. to Amend 1. As stated above, we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 1 is unpatentable. Therefore, Patent Owner's Motion to Amend is before us for consideration. For the reasons set forth below, Patent Owner's Motion to Amend is *denied*.

Proposed substitute claim 20 is reproduced below:

20. (Proposed substitute for Original claim 1)      A method for discarding packets in a data network employing a packet transfer protocol including an automatic repeat request scheme, comprising the steps of:

a transmitter in the data network commanding a receiver <u>having a receiver window</u> in the data network to

29

IPR2013-00636
Patent 6,424,625 B1

a) receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet, wherein the sequence number of the at least one packet is outside of the receiver window and

b) release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet; and

the transmitter discarding all packets for which acknowledgment has not been received, and which have sequence numbers prior to the at least one packet.

Mot. to Amend 1–2.

As the moving party, Patent Owner bears the burden of proof to establish that it is entitled to the relief requested.  37 C.F.R. § 42.20(c).  Therefore, Patent Owner's proposed substitute claims are not entered automatically, but only upon Patent Owner having demonstrated by a preponderance of the evidence the patentability of those substitute claims.  *See, e.g.*, 37 C.F.R. § 42.1(d) (noting that the "default evidentiary standard [in proceedings before the Board] is a preponderance of the evidence").

1. *Written Description Support*

A motion to amend claims must identify clearly the written description support for each proposed substitute claim.  37 C.F.R. § 42.121(b).  The requirement that the motion to amend must set forth the support in the original disclosure of the patent is with respect to *each claim*, not for a particular feature of a proposed substitute claim. The written description test is whether the original disclosure of the application relied upon reasonably conveys to a person of ordinary skill in the art that the inventor had possession of the claimed subject

30

IPR2013-00636
Patent 6,424,625 B1

matter as of the filing date. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). Thus, the motion should account for the claimed subject matter as a whole, i.e., the *entire* proposed substitute claim, when showing where there is sufficient written description support for each claim feature. *See Nichia Corp. v. Emcore Corp.*, Case IPR2012-00005, slip op. at 4 (PTAB June 3, 2013) (Paper 27).

In its Motion to Amend, Patent Owner addresses the written description support for the claimed subject matter as a whole. Mot. to Amend 4–8. For the added "wherein" clause, Patent Owner cites two portions of the '625 patent. *Id.* at 6. Petitioner argues that neither passage describes reception of a packet outside of the receiver window. Opp. to Mot. to Amend 4–6. Patent Owner counters that Petitioner's argument "is premised on the faulty assumption that the receiver and transmitter windows must be of identical size W." PO Reply 1–2. We, however, find Petitioner's arguments persuasive.

In the first passage cited by Patent Owner, the '625 patent describes reception of a packet *within* the receiver window (Ex. 1001, 6:32–36 ("If the difference between N(S) and ESN (for example, ESN1 is less than $2^{k-1}$"), not reception of a packet *outside* of the receiver window. Patent Owner's expert, Dr. Akl, testified that the receiver window size may not equal the transmitter window size (Opp. to Mot. to Amend 5 (citing Ex. 1021, 116:3–118:19)), and Patent Owner argues the same (PO Reply 1–2), but this contention is undermined by Patent Owner's acknowledgement that "[t]he receiver and the transmitter must use the same arbitrary value for W so that the

31

**A0031**

IPR2013-00636
Patent 6,424,625 B1

receiver knows which packets to properly receive." PO Reply 1. As a result, we are not persuaded that column 6, lines 32 to 36 of the '625 patent support the proposed "wherein clause."

With respect to the second passage cited by Patent Owner, we agree with Petitioner that "[t]his disclosure simply describes having a receiver window size of up to $2^{k-1}$ positions; it does *not* describe receiving a packet *outside* the receiver window." Opp. to Mot. to Amend 6.

Accordingly, we are not persuaded that Patent Owner has shown adequate written description support for the proposed amendment.

## 2. *Patentability over Prior Art*

The patent owner bears the burden of proof in demonstrating patentability of the proposed substitute claims over the prior art in general, and, thus, entitlement to add these claims to its patent. *See Idle Free*, Paper 26 at 7. In a motion to amend, the patent owner must show that the conditions for novelty and non-obviousness are met with respect to the prior art available to one of ordinary skill in the art at the time of the invention. With regard to obviousness as the basis of potential unpatentability of the proposed substitute claims, the patent owner should present and discuss facts which are pertinent to the first three underlying factual inquiries of *Graham*: (1) the scope and content of the prior art, (2) differences between the claimed subject matter and the prior art, and (3) the level of ordinary skill in the art, *with special focus on the new claim features* added by the proposed substitute claims. *See Graham v. John Deere Co.*, 383 U.S.

1, 17–18 (1966).  The patent owner should identify each new claim feature, and come forward with technical facts and reasoning about that particular feature.  Some discussion and analysis should be made about the specific technical disclosure of the closest prior art as to each particular feature, and the level of ordinary skill in the art, in terms of ordinary creativity and the basic skill set of a person of ordinary skill in the art, regarding the feature.

Here, we are unpersuaded that Patent Owner has demonstrated, by a preponderance of the evidence, that the proposed substitute claims are patentable.  Specifically, we are not persuaded that the proposed substitute claims are patentable over the combination of Hettich and Vornefeld.

Patent Owner argues that Vornefeld does not anticipate proposed substitute claim 20 because it "creates rather than releases expectation of cells having a lower sequence number."  Mot. to Amend 11.  It also does not render obvious proposed substitute claim 20, according to Patent Owner, because "one ordinary skill in the art would not combine a reference such as Vornefeld that creates expectations with a reference that releases expectations of receiving cells having lower sequence numbers."  *Id.*

Petitioner counters that "[Patent] Owner admits that the concept of receiving packets outside a receiver window is not, by itself, novel, and identifies this mechanism in Vornefeld" and that Patent Owner's expert, Dr. Akl, "testified that it is inherent that one of skill in the art would know to transmit a packet outside the receiver window."  Opp. to Mot. to Amend 7 (citing Mot. to Amend 10; Ex. 1021, 129:4–14,

33

IPR2013-00636
Patent 6,424,625 B1

144:12–144:5).  Moreover, according to Petitioner, Vornefeld does not merely "create expectation of cells having a lower sequence number," as Patent Owner contends.  Rather, it teaches releasing expectation of receiving at least one outstanding I-frame that has a sequence number prior to the most recently received I-frame.  *Id.* at 7–9.

Patent Owner replies that proposed substitute claim 20 is not anticipated by Vornefeld.  PO Reply 2–4.  Patent Owner argues that because "Vornefeld['s] receiver in Fig. 5.3 continues to wait for SN2, expectations for all outstanding packets are not released."  *Id.* at 3.  According to Patent Owner, "[t]he Vornefeld receiver cannot release expectations for outstanding cells because the upper layers in the receiver may require those outstanding cells."  *Id.*  Finally, Patent Owner argues that Broadcom has failed to rebut Patent Owner's showing of patentability because "Broadcom ignores many limitations of the amended claim, including the "releasing" limitation, the "discarding limitation," and the "transmitter limitations."  *Id.*

We find Petitioner's arguments persuasive.  Patent Owner acknowledges that the "concept of receiving packets outside a receiver window is not, by itself, novel," and cites Vornefeld as an example.  Mot. to Amend 10.  Because the added feature is not novel, we must analyze whether proposed substitute claim 20 would have been non-obvious over Vornefeld and other known prior art, such as Hettich.

We are not persuaded by Patent Owner's argument that a person of ordinary skill in the art would not have combined Vornfeled

34

IPR2013-00636
Patent 6,424,625 B1

with a reference such as Hettich.  Specifically, we are not persuaded
that Vornefeld "creates rather than releases expectation of cells having
a lower sequence number" (Mot. to Amend 10), because Vornefeld's
mechanism does result in releasing any expectation of outstanding
packets having sequence numbers prior to the at least one packet
(Opp. to Mot. to Amend 7–9).

We also are not persuaded by Patent Owner's arguments that
proposed substitute claim 20 is "not anticipated by Vornefeld" (PO
Reply 2) because anticipation is not the sole inquiry with respect to
patentability; we also consider non-obviousness.  For the same
reasons, we are not persuaded by Patent Owner's argument that
"Broadcom ignores many limitations of the amended claims,
including the 'releasing' limitation, the 'discarding limitation,' and the
'transmitter limitations.'"  PO Reply 3.  As discussed above, we are
persuaded that these other limitations are taught by Hettich.

Finally, we are not persuaded by Patent Owner's argument that
Vornefeld does not release expectations for "all" outstanding packets
(PO Reply 3) because proposed substitute claim 20 does not require
releasing expectations for "all" outstanding packets.

   *3. Conclusion*

For the foregoing reasons, Patent Owner has not, in its Motion
to Amend, satisfied its burden of proof.

## III.   CONCLUSION

Petitioner has demonstrated, by a preponderance of the
evidence, that claim 1 of the '625 patent is unpatentable under

35

**A0035**

IPR2013-00636
Patent 6,424,625 B1

35 U.S.C. § 102(b) as anticipated by Hettich.  Petitoner's Motion to
Amend is denied.

## IV.   ORDER

Accordingly, it is

ORDERED that claim 1 of the '625 patent is held unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Amend
is *denied*; and

FURTHER ORDERED that, because this is a Final Written
Decision, the parties to the proceeding seeking judicial review of the
decision must comply with the notice and service requirements of 37
C.F.R. § 90.2.

IPR2013-00636
Patent 6,424,625 B1

For PETITIONER:

Dominic E. Massa
Michael A. Diner
WILMER CUTLER PICKERING HALE AND DORR LLP
dominic.massa@wilmerhale.com
michael.diener@wilmerhale.com

For PATENT OWNER:

Peter J. Ayers
J. Christopher Lynch
LEE & HAYES PLLC
peter@leehayes.com
chris@leehayes.com
EricssonIPR2013-00601@leehayes.com
EricssonIPR2013-00602@leehayes.com

Trials@uspto.gov
571-272-7822

Paper 65
Entered: June 1, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

BROADCOM CORPORATION,
Petitioner,

v.

WI-FI ONE, LLC,
Patent Owner.

_____

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)[1]

_____

Before KARL D. EASTHOM, KALYAN K. DESHPANDE, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges*.

CLEMENTS, *Administrative Patent Judge*.

DECISION
Request for Rehearing
*37 C.F.R. § 42.71(d)*

---

[1] We exercise our discretion to issue one Order to be filed in each case.  The
parties are not authorized to use this style heading for any subsequent
papers.

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

## I.    SUMMARY

Patent Owner, Wi-Fi One, LLC,[2] requests rehearing of the Final Written Decisions (IPR2013-00601, Paper 66, "601 Dec."; IPR2013-00602, Paper 60, "602 Dec."; IPR2013-00636, Paper 60, "636 Dec.").  Paper 70 ("Req.").[3]  Patent Owner seeks rehearing on the grounds that:

1.  The Board misapprehended the purpose of the "real party in interest or privy" language in 35 U.S.C. § 315(b), and misapprehended the correct legal standard for determining whether a non-party is a "real party in interest or privy of petitioner" under § 315(b); and

2.  The Board misapprehended the entirety of the factual record and overlooked evidence supporting Patent Owner's contention that certain district court defendants are real parties in interest and/or privies of Petitioner in this proceeding.

Req. 2.  Patent Owner also argues that our Final Written Decisions raise administrative law issues.  *Id.* at 4, 13–15.

The Requests for Rehearing are *denied*.

---

[2] On July 11, 2014, Patent Owner filed an Updated Mandatory Notice in IPR2013-00601 indicating that the patent-at-issue had been assigned to Wi-Fi One, LLC, and that Wi-Fi One, LLC and PanOptis Patent Management, LLC are now the real parties-in-interest.  Paper 43.  The same paper was filed in IPR2013-00602 (Paper 40) and IPR2013-00636 (Paper 38).

[3] Patent Owner filed a Request for Rehearing in each of IPR2013-00601 (Paper 70), IPR2013-00602 (Paper 64), and IPR2013-00636 (Paper 64).  All three requests put forward substantively the same arguments and, thus, we address them together with reference to the Request in IPR2013-00601.  Citations are to IPR2013-00601, unless otherwise noted.

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

## II.    DISCUSSION

The applicable standard for a request for rehearing is set forth in

37 C.F.R. § 42.71(d), which provides in relevant part:

> A party dissatisfied with a decision may file a request for rehearing, without prior authorization from the Board. The burden of showing a decision should be modified lies with the party challenging the decision. The request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion, opposition, or a reply.

### A. 35 U.S.C. § 315(b)

Patent Owner argues that the Board misapprehended the purpose of

the "real party in interest, or privy" language of § 315(b). Req. 4.

Specifically, Patent Owner argues that "the legislative purpose of [35 U.S.C.

§ 315(b)] is to ensure IPR Petitions are not used as a litigation tactic for

purposes of delay" (*id*. at 4), and that "[t]he plain text of the statute makes

clear that . . . § 315(b) is intended to prevent litigation defendants from

subverting the statutory time-bar by having their agents or cohorts file an

IPR petition that they themselves are barred from filing" (*id*. at 5). Patent

Owner also argues that the legal standard for determining whether a third

party is a "real party in interest, or privy of petition" under § 315(b) "is

purposefully broad and flexible so that the Board can determine, on a case-

by-case basis and in light of all relevant facts, whether particular parties are

attempting to circumvent the § 315(b) time-bar." Req. 7.

Patent Owner has not argued in its Patent Owner Response the

legislative purpose of § 315(b). We could not have misapprehended or

overlooked arguments not before us. Moreover, Patent Owner identifies

3

**A0326**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

nothing in our Decision that it contends mischaracterizes the legislative purpose of § 315(b). We are not persuaded, therefore, that we have overlooked or misapprehended the legislative purpose of § 315(b).

Patent Owner also argues that we misapprehended the legal test that should be applied to determine whether a non-party is a "real party in interest, or privy" for purposes of § 315(b). Req. 6. Specifically, Patent Owner contends that "the Board applied a narrow and rigid standard that is erroneous as a matter of law" (*id.* at 7) because it "requires — as an absolute and necessary condition — that Broadcom controlled or could have exercised control over one or more of the District Court Defendants in relation to the District Court Litigation" (*id.*) without "also considering, *inter alia*, the non-party's control over the IPR" (*id.* at 8). According to Patent Owner, "the issue under § 315(b) is whether the District Court Defendants have attempted to circumvent the one-year statutory time-bar." Req. 9.

Although our Decision on Patent Owner's Motion for Additional Discovery (Paper 23) focuses primarily on Broadcom's ("Petitioner") exercise of control, or opportunity to exercise control over the prior District Court lawsuit (Req. 8), that is because that was the focus of Patent Owner's Motion for Additional Discovery. *See, e.g.,* Paper 14, 6 ("Here, evidence will prove that Broadcom has had the opportunity to control and maintains a substantive legal relationship with the D-Link Defendants sufficient to bind Broadcom to the District Court's judgment.").

That decision, however, did not characterize the legal standard, for all cases, as being limited strictly to a petitioner's control, or opportunity to control, a non-party in previous litigation. To the contrary, it addressed

4

**A0327**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

control, or opportunity to control, by a non-party generally as one of a number of factors:

> Whether parties are in privity, for instance, depends on whether the relationship between a party and its alleged privy is "sufficiently close such that both should be bound by the trial outcome and related estoppels." [*Office Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,759 (Aug. 14, 2012]. Depending on the circumstances, a number of factors may be relevant to the analysis, including whether the non-party "exercised or could have exercised control over a party's participation in a proceeding," and whether the non-party is responsible for funding and directing the proceeding. *Id*. at 48,759-60.

Paper 23, 7.

That decision also addresses Patent Owner's theory that the indemnity agreements imply that the District Court Defendants are real parties in interest in these *inter partes* reviews ("IPRs"). *See id*. at 12–13. Patent Owner relied on substantively the same arguments and evidence in its Patent Owner Response as in its Motion for Additional Discovery, and our Final Written Decision, thus, applied essentially the same analysis. 601 Dec. 8–9. Accordingly, we are not persuaded that we misapprehended the proper legal standard for establishing privity or real party in interest.

## B. District Court Defendants

Patent Owner argues that we misapprehended and overlooked evidence establishing that certain District Court defendants are real parties in interest and/or are in privity with Petitioner for purposes of this proceeding. Req. 10–13. Specifically, Patent Owner argues that it has made "a strong circumstantial showing that Petitioner and at least some of their District Court Defendant customers are in cahoots" because "there are indemnity

5

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

agreements," they "share a common economic and legal interest," and
"[Petitioner] has been coordinating with the District Court Defendants for
many years." *Id.* at 11–12. According to Patent Owner, "the Board erred
when it decided the § 315(b) issue without reviewing the known indemnity
agreements." *Id.* at 12.

Patent Owner's arguments are not persuasive. The evidence cited by
Patent Owner were Paper 3, and Exhibits 2005 and 2015–2018. PO
Resp. 8–14. Exhibit 2018 is a final judgment of infringement in the co-
pending district court litigation that sheds no light on whether Broadcom
controlled, or could have controlled, the district court defendants, or vice-
versa. All of the other evidence was considered in our Decision on Patent
Owner's Motion for Additional Discovery. For example, we considered,
and rejected, Patent Owner's argument that an indemnity relationship is
sufficient to establish privity:

> Contrary to Ericsson's assertion that "[t]he weight of authority
> strongly supports that an indemnity agreement . . . establish[es]
> privity," Mot. 6, *Bros. Inc, TRW, Dentspl[]y* and other cases
> noted *supra* illustrate that more is required. Control of the
> litigation, or some sort of representation, constitutes a "crucial"
> factor. *Dentsply*, 42 F.Supp.2d at 398.

Paper 23, 9. As we indicated in our Final Written Decision, Patent Owner's
Response relied on substantively the same arguments and evidence as its
Motion for Additional Discovery, and we were not persuaded for the same
reasons as explained in our decision on that motion. 601 Dec. 8–9.
Accordingly, we are not persuaded that we misapprehended or overlooked
the evidence relied upon by Patent Owner. To the extent Patent Owner is
arguing that we should have granted its Motion for Additional Discovery

6

**A0329**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

directed to the indemnity agreements, the argument is untimely because our decision denying that discovery was issued well over a year before our Final Written Decision, Patent Owner requested rehearing (Paper 27) and we denied that request (Paper 28). *See* 37 C.F.R. § 42.71(d)(1).

In these proceedings, Patent Owner does not set forth a persuasive argument, supported by evidence, that the District Court Defendants funded, controlled, or could have controlled these proceedings, or that Petitioner's indemnity agreements even mention IPRs, let alone would show funding, control, or ability to control IPRs, or would have obligated Broadcom to file specific, if any, IPRs. *See* Req. 12. Instead, Patent Owner generally asserts that "Broadcom's duty to indemnify triggered the successive attack on [it]s patents," without specifying, based on cited precedent supporting the theory, how even a generic trigger for some unspecified future action, even if it existed, elevates the District Court Defendants to real parties in interest in the IPRs. *See* PO Resp. 13.

Patent Owner also argues that Petitioner failed to provide evidence of the non-party's lack of participation in, or control over, this proceeding, and that the Declaration of David Djavaherian (Ex. 1007) submitted by Petitioner in its Opposition to Patent Owner's Motion for Additional Discovery is carefully worded to obscure the true nature of the relationship between Petitioner and the District Court defendants. Req. 11, 12. Patent Owner did not make these arguments in the Patent Owner Response. We, therefore, could not have misapprehended or overlooked them.

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

### C. Administrative Law Issues

Patent Owner argues that "the Board's Final Written Decision and other actions in this IPR are *ultra vires*, undertaken without statutory authority." Req. 13. Specifically, Patent Owner argues the following:

> The Board's refusal to consider a reasonably full evidentiary record in connection with the § 315(b) issue; its denial of all discovery on the issue; and its refusal to consider the terms of the known indemnity agreement and other known facts all violate the Board's duties under the APA. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1581 (10th Cir. 1994); *Intel Corp. v. U.S. Int'l Trade [Comm'n]*, 946 F.2d 821, 836-39 (Fed. Cir. 1991).

*Id.* at 14. Patent Owner also argues that (1) our actions are inconsistent with public statements made during the rulemaking process and, therefore, violate the Administrative Procedure Act ("APA"); (2) our Decision is contrary to 37 C.F.R. § 42.3(b) and our failure to follow our rules is contrary to the APA; and (3) our Decision does not establish that we have jurisdiction to hear this petition in light of 35 U.S.C. § 315(b), contrary to the APA. *Id.* at 15.

Patent Owner's arguments are predicated on its contention that we lack jurisdiction under § 315(b) because the defendants in the co-pending district court litigation are real parties-in-interest who were served with a complaint alleging infringement more than one year before the filing of the Petitions in these proceedings. As discussed above, we are not persuaded that we erred in determining that those defendants are not real parties in interest. As a result, we are not persuaded that the Petitions were time-barred under § 315(b), and we are, therefore, not persuaded that our Final Written Decisions are *ultra vires* actions that exceed our statutory authority.

8

**A0331**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

### III.   Conclusion

For the foregoing reasons, Patent Owner has not shown that our Final Written Decision in IPR2013-00601 should be modified.  For the same reasons, Patent Owner also has failed to show that our Final Written Decisions in IPR2013-00602 and IPR2013-00636 should be modified.

### ORDER

Accordingly, it is:

ORDERED that Patent Owner's Requests for Rehearing are *denied*.

**A0332**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

For PETITIONER:

Dominic E. Massa
Michael A. Diner
Zachary Piccolomini
WILMER CUTLER PICKERING HALE AND DORR LLP
Dominic.massa@wilmerhale.com
michael.diener@wilmerhale.com
Zachary.piccolomini@wilmerhale.com

For PATENT OWNER:

Peter J. Ayers
J. Christopher Lynch
Sarah Spires
LEE & HAYES PLLC
peter@leehayes.com
chris@leehayes.com
Sarah.spires@skiermontpuckett.com

10

**A0333**

US006424625B1

(12) **United States Patent**
Larsson et al.

(10) Patent No.: **US 6,424,625 B1**
(45) Date of Patent: **Jul. 23, 2002**

(54) **METHOD AND APPARATUS FOR DISCARDING PACKETS IN A DATA NETWORK HAVING AUTOMATIC REPEAT REQUEST**

(75) Inventors: **Peter Larsson**, Euro Asia View; **Mikael Larsson**, Doer Park, both of (SG)

(73) Assignee: **Telefonaktiebolaget LM Ericsson (publ)**, Stockholm (SE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/179,952**

(22) Filed: **Oct. 28, 1998**

(51) Int. Cl.[7] ............................................. **H04L 12/26**
(52) U.S. Cl. ...................................... **370/236**; 370/410
(58) Field of Search .................................. 370/389, 394, 370/410, 426, 428, 429, 470, 471, 473, 236; 714/748, 749, 750

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,344,171 A | * | 8/1982 | Lin et al. | 714/751 |
| 4,726,027 A | * | 2/1988 | Nakamura et al. | 714/748 |
| 5,483,545 A | * | 1/1996 | Darmon et al. | 714/748 |
| 5,826,028 A | | 10/1998 | Bennett et al. | |
| 6,163,861 A | * | 12/2000 | Yoshioka et al. | 714/712 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | 98/42108 | 9/1998 |

OTHER PUBLICATIONS

Heliomar M. de Lima and Otto Carlos M.B. Duarte, "A Go–Back–N Protocol with Multicopy Retransmission for High Speed Satellite Communications", 1994, pp. 859–863.
F. Argenti and G. Benelli, "An ARQ Protocol For Mobile Radio Systems", 1992, pp. 1323–1326.
Nachum Shacham and Byung Cheol Shin, "A Selective–Repeat–ARQ Protocol for Paralle Channels and Its Resequencing Analysis", Apr. 1992, pp. 773–782.
Standard Search Report dated Jul. 16, 1999.

* cited by examiner

*Primary Examiner*—Kwang B. Yao
(74) *Attorney, Agent, or Firm*—Burns, Doane, Swecker & Mathis, L.L.P.

(57) **ABSTRACT**

Techniques are provided for use with automatic repeat request (ARQ) schemes in a data network to minimize a bandwidth used by a receiver and a transmitter in the network to transfer data packets, by discarding outdated packets that have not yet been successfully transferred. In accordance with an embodiment of the invention, a bit is set in the ARQ packet header to force the receiver to accept packets subsequent to one or more erroneous or unreceived packets that have been discarded and not resent. In accordance with another embodiment of the invention, after data packets have been discarded, sequence numbers are reassigned to the non-discarded data packets that are yet to be sent to the receiver, so that a transmitted stream of the non-discarded packets will have consecutive sequence numbers.

**19 Claims, 12 Drawing Sheets**



FIG. 1A (PRIOR ART)

FIG. 1B (PRIOR ART)



FIG. 2 (PRIOR ART)



FIG. 3D
(PRIOR ART)

Retransmission from N(R) up to TSN. BSN is set to N(R).

FIG. 3C
(PRIOR ART)

Erroneous or lost LLC PDUs. A NACK with N(R)=ESN is issued.

FIG. 3B
(PRIOR ART)

LLC PDUs sent. All are received.

FIG. 3A
(PRIOR ART)



LLC PDUs sent.
All are received.
BSN is set to N(R)+1.

FIG. 4D
(PRIOR ART)

PACK issued.

FIG. 4C
(PRIOR ART)

LLC PDUs sent.
All are received.

FIG. 4B
(PRIOR ART)

FIG. 4A
(PRIOR ART)



FIG. 5
(PRIOR ART)



FIG. 6
(PRIOR ART)



ESN 1,2,3 are missing. NACK(s) is/are sent for all outstanding packets.

FIG. 7A
(PRIOR ART)

ESN1 has been retransmitted and correctly received. ESN2 is currently being retransmitted. BSN is set to ESN1 - 1, i.e. NACK with cumulative PACK for preceeding packets.

FIG. 7B
(PRIOR ART)

ESN1-3 has successfully been received. Some more new packets have also been sent.

FIG. 7C
(PRIOR ART)



## FIG. 8



## FIG. 9



FIG. 10A



FIG. 10B



# FIG. 11



## FIG. 12

A0049



# FIG. 13

1

## METHOD AND APPARATUS FOR DISCARDING PACKETS IN A DATA NETWORK HAVING AUTOMATIC REPEAT REQUEST

### FIELD OF THE INVENTION

The present invention relates to Automatic Repeat Request (ARQ) techniques for transferring data in fixed/wireless data networks.

### BACKGROUND OF THE INVENTION

ARQ techniques are commonly used in data networks to ensure reliable data transfer and to protect data sequence integrity. Data packets are encoded with an error detecting code, so that when a transmitter in the data network sends or transfers data packets to a receiver in the data network, the receiver receiving the data packets can detect corrupted, erroneous or lost packets and thereby request that the transmitter retransmit the affected data packets. The integrity of a data sequence is normally protected by sequentially numbering packets and applying certain transmission rules.

There are three main ARQ schemes: Stop-and-Wait; Go-Back-N; and Selective Reject (sometimes referred to as Selective Repeat). All three methods provide mechanisms for transferring packets to a receiver in a data network in an appropriate order. In terms of throughput efficiency as a function of the signal to noise ratio, generally Selective Reject is most efficient, Stop-and-Wait is least efficient, and Go-Back-N is intermediate. Also, various mixtures of the Selective Reject and Go-Back-N techniques exist, and fall between pure Selective Reject and pure Go-Back-N techniques in both efficiency and complexity.

With respect to Go-Back-N, several different variants exist which differ in terms of how they use positive acknowledgments (PACKs), negative acknowledgments (NACKs), retransmission timers, polling schemes, etc.

One type of Go-Back-N technique uses both PACKs and NACKs that have the following characteristics:

A PACK for a data packet having a sequence number N(R) gives a cumulative positive acknowledgment for data packets having sequence numbers before N(R), but does not positively acknowledge the data packet having the sequence number N(R), as shown for example in FIG. 1A.

The NACK positively acknowledges all data packets before the data packet it negatively acknowledges. The data packet which the NACK negatively acknowledges is indicated by N(R), as shown for example in FIG. 1B.

FIG. 2 shows a simplified ARQ transmitter window, in which five variables are used to keep track of a transmitter state. The five variables include: a bottom sequence number, BSN; a top sequence number, TSN; a maximum top sequence number, $TSN_{MAX}$; an instant sequence number, ISN; and an expected sequence number, ESN.

BSN denotes the oldest packet in the transmitter buffer, and can also indicate that all packets before the BSN packet have been acknowledged or discarded. Packets prior to the packet indicated by TSN have been sent. ESN denotes the expected sequence number of a packet to be received. ISN indicates the sequence number of the next packet to be sent. When a packet is sent for the first time, TSN and ISN will be identical. When a retransmission is performed, ISN will start over from the first retransmitted packet and progress in consecutive order, one packet at a time, up to TSN. TSN cannot exceed $TSN_{MAX}$, which is defined by the window size W. Assuming that a sequence number field has

2

k bits, $2^k$ different sequence numbers can be created. Thus, the maximum size W of the window shown in FIG. 2 is $2^k-1$.

Operation of the Go-Back-N technique using both PACKs and NACKs can be envisioned by imagining a clockwise consecutive modulo $2^k$ sequence numbering superimposed upon the circumference of the circles shown in FIGS. 3A–3D. FIG. 3A shows a circle indicating a state where no packets have yet been sent, and TSN, ESN, BSN and ISN all have the same value, i.e., point to the same packet. The circle shown in FIG. 3B indicates that (TSN-BSN) packets have been sent and also received, since ESN=TSN. An erroneous or lost packet causes ESN to stop progressing forward, although more packets have been sent. For example, in FIG. 3C packets up to the packet indicated by TSN and ISN have been sent, but ESN indicates a prior packet which was not received. After a packet is lost or an erroneous packet is received, the ARQ receiver sends a NACK to the ARQ transmitter to inform the ARQ transmitter about the lost or erroneous packet. The NACK includes a returned sequence number N(R) that is set equal to ESN, thereby acknowledging that all previous packets were correctly received. BSN and ISN are set equal to ESN (and N(R)) so that BSN moves forward and ISN moves backward to the sequence number representing the lost or erroneous packet. Thereafter, as shown in FIG. 3D, ISN and ESN move forward together as the lost or erroneous packet is retransmitted, and as the succeeding packets are also retransmitted.

FIGS. 4A–4D illustrate use of a PACK. For example, FIG. 4A shows a state where nothing has yet been sent, and TSN=ISN=BSN=ESN. FIG. 4B shows a situation where all sent packets have been correctly received. FIG. 4C shows that a timer-initiated PACK is sent, conveying the sequence number N(R) of a packet between BSN and TSN=ESN= ISN. As shown in FIG. 4D, after the PACK is sent, BSN is set to N(R).

Sending PACKs ensures that sequence number starvation does not occur. Since TSN may not pass BSN, if the transmitter does not receive PACKs, it may continue to send data packets up to $TSN_{MAX}$. However, if data packets up to $TSN_{MAX}$ are sent but no PACKs are received, then $TSN_{MAX}$ cannot progress and sequence number starvation occurs. The transmitter must wait until it receives a PACK, which will allow BSN and thus $TSN_{MAX}$ to progress.

FIG. 5 shows a general example of an ARQ data packet 510. The packet 510 typically includes an ARQ header 512 and a data portion 516. The header 512 contains a k-bit sequence number 514, and can be located at the front of the packet 510 as shown in FIG. 5, or at any predefined position within the packet 510.

FIG. 6 shows an exemplary ACK message 610, with an identifier field 612 that identifies the responding terminal sending the ACK message 610, a NACK/PACK type indicator 614 indicating whether a PACK or a NACK is being sent, and finally a sequence number field N(R) 616 that indicates for which sequence number the ACK message 610 is valid.

In a Selective Reject scheme, a sender window having a size of $2^{k-1}$ or less is normally used in order to avoid certain ambiguities which appear in conjunction with an automatic (timer-initiated) retransmission. The receiver window size in a Selective Reject scheme can include up to $2^{k-1}$ positions, instead of just one position as in a Go-Back-N scheme. In Selective Reject a range of packets can be received since the receiver window can include up to $2^{k-1}$ positions.

As long as packets are received correctly, they are sent or forwarded to the next higher layer. When an outstanding

US 6,424,625 B1

3

packet is detected, i.e., a packet that has been sent but not received or not correctly received, the sending of subsequent packets up to the higher layer is halted and a list of correct and missing packets is built up. A NACK is used to initiate a request for a retransmission of the outstanding packet or of a multitude of outstanding packets. When the first detected outstanding packet is correctly received, that packet and all subsequent packets are sent to the higher layer, until the next outstanding packet is detected and the process repeats with respect to the new outstanding packet.

FIG. **7A**, for example, shows a situation wherein three packets are outstanding. The outstanding packets are denoted by ESN1, ESN2 and ESN3. The receiver sends one or several NACKs indicating the sequence number of these outstanding packets. In FIGS. **7B** and **7C**, the transmitter has received the one or several NACKs and in response retransmits the outstanding packets. The transmission of new packets can proceed to the $TSN_{MAX}$ limit, which of course can also occur when no NACKs are received. In particular, FIG. **7B** shows a situation where ESN1 has been retransmitted and correctly received, and ESN2 is currently being retransmitted. BSN has also been set to ESN1. In other words, the NACK for ESN1 functions as a cumulative positive acknowledgment for packets preceding ESN1, and BSN is adjusted accordingly.

Sometimes, NACKs fail to reach the transmitter for unknown reasons. In such a situation, after a specified or predetermined time has expired, packets in the sender buffer that have not been acknowledged (by either a NACK or a PACK) can be automatically retransmitted.

NACKs can be efficiently sent by sending a NACK and explicitly indicating the oldest NACK's sequence number, here represented by ESN1, and using a bitmap to thereafter represent correctly received packets and missing packets. This type of NACK performs a cumulative PACK for the packets preceding the sequence number which is NACKed. Other NACK options can also be used, for example NACK options where a cumulative positive ACK is not performed or sent for the packets preceding the sequence number which is NACKed.

The Selective Reject and Go-Back-N techniques differ in the sense that Selective Reject does not require packets to be sent in any particular order, while the Go-Back-N receiver needs to receive packets in consecutive sequence number order.

Normally, in data networks it is desirable to transfer all packets without any packet loss. Sometimes, however, sending significantly delayed packets provides no benefit, for example where the delay causes the information in the packets to become outdated and therefore useless to the receiver. Examples of delay sensitive applications are, e.g., telephony, video conferencing and delay sensitive control systems.

Furthermore, non-time-critical applications commonly issue higher level retransmissions whenever they detect an absence of responses or acknowledgments from the receiving end, which can give rise to situations where the ARQ buffers are filled with not-yet-successfully transmitted data, and/or with newly retransmitted data. This can be avoided if data is associated with a validity time, and the validity time is set to be slightly shorter than the retransmission time for the application. However, in practice it can be difficult or impossible to discern which retransmission time is used, since the lower layer (LLC) is unaware which application is at the top level. In such a situation one has to assume a certain application and specially design the communication system based on that assumption.

4

For certain service classes and after a certain transfer delay time, discarding of data packets is allowed in Asynchronous Transfer Mode (ATM). An ARQ in conjunction with ATM can use transfer delay information provided by the ATM layer in order to adjust connection-specific discard timers in the ARQ function. However, the ARQ in the receiver may detect missing or incomplete packets and require retransmission.

In summary, current ARQ methods do not recognize and allow for situations where data packets have a limited lifetime, and therefore fail to minimize bandwidth usage by not sending (or resending) significantly delayed or outdated data packets.

## SUMMARY OF THE INVENTION

In accordance with exemplary embodiments of the invention, ARQ techniques are provided that minimize bandwidth usage by accounting for data packets that have an arbitrary but limited lifetime. The lifetime can either be assumed to be fixed, or can be deduced from ATM layer information. In particular, exemplary embodiments of the invention variously illustrate enhanced Go-Back-N and also Selective Reject techniques that discard outdated data packets, and which embody principles that can be applied to Stop-and-Wait techniques to discard outdated data packets.

In accordance with an embodiment of the invention, a bit is set in the ARQ header to force the receiver to accept packets subsequent to one or more erroneous or unreceived packets that have been discarded and not resent.

In accordance with another embodiment of the invention, when a NACK has been received and data packets have been discarded, sequence numbers are reassigned to the non-discarded data packets so that a transmitted stream of the non-discarded packets will have consecutive sequence numbers.

In accordance with another embodiment of the invention, at a packet discard the transmitter monitors the receiver state. If a packet is expected which has already been discarded, then the transmitter resynchronizes by renumbering data packets or by commanding the receiver to accept an arbitrarily chosen sequence number.

## BRIEF DESCRIPTION OF THE DRAWINGS

Other objects and advantages of the invention will become apparent to those skilled in the art from the following detailed description of preferred embodiments, when read in conjunction with the accompanying drawings. Like elements in the drawings have been designated by like reference numerals.

FIGS. **1A** and **1B** illustrate a prior art Go-Back-N technique.

FIG. **2** illustrates a window in a prior art Go-Back-N technique.

FIGS. **3A–3D** illustrate a transmission sequence in a prior art Go-Back-N technique.

FIGS. **4A–4D** illustrate use of a positive acknowledgment in a prior art Go-Back-N technique.

FIG. **5** illustrates a prior art example of an ARQ data packet.

FIG. **6** illustrates a prior art example of an acknowledgement message.

FIGS. **7A–7C** illustrate use of a negative acknowledgment in a prior art Selective Reject technique.

FIG. **8** illustrates a receiver packet enforcement bit in accordance with an embodiment of the invention.

5

FIG. **9** illustrates operation of an embodiment of the invention.

FIGS. **10A** and **10B** illustrate operation of an embodiment of the invention.

FIG. **11** illustrates operation of an embodiment of the invention.

FIG. **12** illustrates operation of an embodiment of the invention.

FIG. **13** illustrates operation of an embodiment of the invention.

## DETAILED DESCRIPTION OF THE INVENTION

In accordance with an exemplary embodiment of the invention involving a communications system wherein a transmitter and a receiver are exchanging data packets, at a packet discard procedure, the progress of a bottom part of a sender window of the transmitter is reported to the receiver in order to allow the receiver to properly skip packets which do not exist anymore because they have been discarded. Thus, the receiver can be commanded to skip or overlook the packets which have been discarded, or in other words, to release any expectation of receiving the packets which have been discarded. To prevent ambiguity problems, special rules are defined for, and followed by, the receiver and the transmitter.

In the case where the transmitter discards a packet, it orders the receiver to accept the next packet, by setting a certain Receiver Packet Enforcement Bit (RPEB) in the ARQ header of the next packet and sending the packet to the receiver. When the receiver receives the packet, the RPEB bit will cause the receiver to accept the packet. FIG. **8** shows an ARQ packet **810** with an ARQ header **812** and a data portion **818**. The header **812** includes a receive packet enforcement bit RPEB **814**, and a k-bit sequence number N(S) **816**. Alternatively, a plurality of enforcement bits can be sent separately from the ARQ packets together with implicit or explicit indications as to which ARQ packet each enforcement bit belongs.

This enforcement function of sending an RPEB associated with a particular ARQ packet, can be used a variety of situations. For example, a situation can arise where a NACK associated with an ARQ packet designated by a sequence number N(R) is sent by the ARQ receiver and properly received by the ARQ transmitter. If the NACK is valid for one discarded data packet, then the next packet to be retransmitted can have an RPEB set to TRUE.

In another example situation, a retransmission timer expires and one or more data packets have been discarded. The next incoming data packet to be transmitted, or the first data packet to be retransmitted, can have an RPEB set to TRUE.

The system can be further configured so that in all other situations, the RPEB associated with a data packet is set FALSE.

In particular, when the system uses a Go-Back-N type packet exchange, two types of packet enforcement schemes can be used. The first type is a general method with an arbitrary window size W, and the second type is a special case of the general method. In the special case, the window size is $W=2^{k-1}$, i.e., half the maximum sequence number.

In the method of the special case, ambiguities can be circumvented by applying very simple rules. The method of the special case employs a new variable, DSN. DSN is shown, for example, in FIG. **9**, and indicates that all previous

6

packets have been acknowledged as having been properly transmitted and received. In FIG. **9**, all packets from DSN through BSN-1 have been discarded due to a packet discard time-out. A packet discard time-out can occur, for example, when the oldest packets in the buffer have been in the buffer for a predetermined amount of time, and are discarded upon expiration of the predetermined amount of time. When the old packets are discarded, the value of BSN is incremented until it points to the oldest remaining (i.e., undiscarded) packet in the buffer. FIG. **9** shows BSN pointing to the oldest remaining packet in the buffer. After the predetermined amount of time expires, the value of TSN is greater than or equal to the new value of BSN. This indicates that packets from BSN through TSN-**1** have been sent. TSN indicates the next new packet to send, and ISN has the same function as indicated earlier, namely, to indicate the sequence number of the next packet to be sent. ESN (e.g., ESN1) indicates the sequence number of the next packet that the receiver expects to receive. To prevent ambiguities, TSN must not pass $TSN_{MAX}$. In this alternative, $TSN_{MAX}$ is $DSN+2^{k-1}$.

Although the data packets between DSN and BSN have been discarded as shown in FIG. **9**, for some unknown reason either the previous ACKs have not made their way from the ARQ receiver to the ARQ transmitter or the ARQ packets from ESN1 up to TSN have not been received. That explains why ESN1 is in the sequence of sequence numbers representing discarded ARQ packets, or in other words, why the receiver is expecting a sequence number which has been discarded. At this juncture either a retransmission timer initiates the retransmission, or a NACK is properly received. In both cases, the RPEB is set to TRUE for the next packet to be transmitted. If the difference between N(S) and ESN (for example, ESN1) is less than $2^{k-1}$ and RPEB=TRUE at a packet reception, then the packet will be accepted and forwarded to higher layer as long as the data carried in the packet is also correct.

FIG. **9** also shows that no ambiguity will occur when $TSN_{MAX}$ is defined as $DSN+2^{k-1}$. When ESN (ESN1) lags behind BSN, the receiver can always be forced to receive an ARQ packet whose RPEB=TRUE. If ESN (ESN1) is leading BSN and the RPEB for a received ARQ packet is TRUE, then the packet shall not be accepted. This can be determined by discerning whether BSN-ESN exceeds $W=2^{k-1}$. If a NACK is received in the ARQ transmitter for a higher sequence number than TSN, then a fault has occurred and a reinitialization or a restart is likely to take place. In a reinitialization or a restart, all counters and/or variables are reset to a certain value so that the ARQ can restart anew. For example, the variables can be set so that TSN=ISN=BSN= ESN=DSN, and so forth.

FIGS. **10A** and **10B** show the variable definitions more precisely, by showing two cases. FIG. **10A** shows a case where the content in the buffer is low, and FIG. **10B** shows a case where the buffer is very full. FIGS. **10A** and **10B** also indicate that an upper limit (fixed or dynamic) may exist for the packet buffer. There may also be packets which have been received from the higher layer, but were not allowed to be transmitted since TSN might have reached $TSN_{MAX}$. Such packets would be pending for transmission, and indicated by pending sequence number PSN shown in FIG. **10B**. As soon as clearance is given to proceed, the pending packets will be transmitted. Clearance is given when a NACK or PACK is properly received, thereby causing DSN and perhaps also BSN to progress forward. This allows $TSN_{MAX}$ to progress forward also.

The more general case, on the other hand, requires more complex rules. The function of the ARQ transmitter with an

US 6,424,625 B1

7

arbitrary window size representing a more general case is next described.

FIG. 11 shows an arbitrary state of the ARQ. The general case differs from the special case described above in that the window size (W) is defined using BSN rather than DSN. This gives the greatest possible distance between the last acknowledged packet (DSN) and the highest sent packet (TSN). As in the special case, TSN may not pass $TSN_{MAX}$. $TSN_{MAX} = BSN + W$, where $1 \leq W \leq 2^{k-1}$.

Below, the sign $\leq$ is used. It is used more in the "before" and "after" sense than in the ordinary mathematical sense, since we are using modulus arithmetic. For example, assume k=8 bits, BSN=192 and W=128. This yields $BSN + W = (192 + 128) \bmod 2^k = 64$. TSN can be, e.g., 254, which is before $BSN + W$, even though mathematically $254 > (192 + 128) \bmod 2^k = 64$.

Some important conditions are $TSN \leq DSN - 1$, $TSN \leq TSN_{MAX}$, and $DSN \leq TSN$, where $TSN_{MAX} = BSN + W$. W can assume an arbitrary value between 1 and $2^{k-1}$. However, the receiver and transmitter must both use the same arbitrary value for W.

A packet shall be accepted, apart from the normal Go-Back-N rule, when $N(S) - ESN < 2^k - W$, RPEB=TRUE and the data in the packet are correct.

An additional rule for the general case is that in order to avoid ambiguity problems, BSN-DSN shall always be less than $2^k - W$. If a situation arises where $(BSN - DSN) = 2^k - W$, then typically either a resynchronization will take place, or a notification indicating bad link performance will be sent to the control and management layer. The control and management layer can then implement a countermeasure to handle the problem.

In another exemplary embodiment of the invention illustrated for example in FIG. 12, a Selective Reject type packet exchange is used that relies on the same basic principles described above with respect to the special and general cases for use with a Go-Back-N type packet exchange. Namely, a receive enforcement bit such as the RPEB described above with respect to other embodiments, is sent to facilitate discarding of packets from a transmitter buffer.

In this embodiment, the basic rules include $DSN \leq BSN \leq TSN \leq TSN_{MAX}$ and $TSN_{MAX} - DSN = 2^{k-1}$. The variable definitions are the same as those described above with respect to other embodiments. Some additional rules on how to handle NACK, PACK and automatic retransmission of packets will also be described below.

In a situation where a number of packet retransmissions have taken place, a packet discard time-out can occur that will cause the oldest, not-yet-acknowledged packets in the buffer to be discarded. This can be seen, for example, in FIG. 12, where the packets having sequence numbers between DSN and BSN have been discarded.

After the old packets have been discarded from the transmitter buffer, two things can happen. Either a packet retransmission command is invoked by a timer expiration, or a NACK is received for a sequence number falling between DSN and BSN. First, consider the NACK case.

Assume that one use of NACK includes the following characteristics. When a NACK is sent, the oldest not-yet-received packet is explicitly indicated by its sequence number. Packets with sequence numbers preceding this oldest, outstanding packet are at the same time positively acknowledged by this NACK message. Accompanying this NACK can be a) a bitmap of length n indicating outstanding packets, wherein, for example, those bits that are set to one

8

indicate outstanding packets, or b) a number N of explicitly indicated sequence numbers for which packets have not been received, or c) some combination of a) and b).

In a first case, with reference to FIG. 12, if a NACK is received for ESN1 in the interval DSN to BSN and the covered ACK range for the NACK is less than BSN-ESN1 and at least one packet is not yet discarded ($TSN \neq BSN$), then the packet indicated by BSN with RPEB set to True, is retransmitted. Note that the transmitter can also send a short control message, in order to inform the receiver that packets have been discarded, thereby saving bandwidth.

In a second case, if a NACK is received for ESN1 located in the interval between DSN and BSN and the covered ACK range for the NACK is less than BSN-ESN1 and all packets have been discarded, i.e. BSN=TSN, then a pending packet with RPEB=TRUE is sent. However, if no packet is pending for transmission, then the system either a) waits until the next packet is received from the higher layer and then sends this packet with RPEB=TRUE, or b) informs the receiver that there are currently no more packets to send. A shorter message than the packet can be used instead to inform the receiver that packets have been discarded; thereby conserving bandwidth.

In a third case, if a NACK is received for ESN1 in the interval DSN to BSN, and the covered ACK range for the NACK is greater than BSN-ESN1, and at least one packet is not yet discarded, and at least one outstanding packet exists that has a sequence number $\geq$ BSN, then the first outstanding packet after BSN, as indicated by the NACK message, is retransmitted with RPEB=TRUE.

In a fourth case, if a) a NACK is received for ESN1 in the interval between DSN and BSN, and b) the covered ACK range for the NACK is greater than BSN−ESN1, and c) at least one packet exists that has been sent but not acknowledged either positively or negatively and which has a sequence number after the packet indicated by the NACK message, and d) there are no outstanding packets indicated in the NACK message with sequence numbers $\geq$ BSN, then the first packet after the packets indicated in the NACK message is retransmitted with RPEB=TRUE. A shorter message than the packet can be used instead to inform the receiver that packets have been discarded, thereby saving bandwidth.

In a fifth case, if a) a NACK is received for ESN1 in the interval DSN to BSN, and b) the covered ACK range for the NACK is greater than BSN-ESN1, and c) no packet exists after the packet indicated by the NACK message, and d) there are no outstanding packets indicated in the NACK message with sequence numbers $\geq$ BSN, then a packet which is pending for transmission is sent with RPEB= TRUE. In other words, when all packets having sequence numbers N(S) in the range from BSN to TSN (i.e., $TSN \geq N$ $(S) \leq BSN$) have been positively acknowledged, then a packet which is pending for transmission is sent with RPEB=TRUE. However, if no packet is pending for transmission, then the system waits until the next packet is received from the higher layer and then sends this next packet with RPEB=TRUE, or alerts the receiver that there are currently no more packets to send. A shorter message than the packet can be used instead to alert the receiver that packets have been discarded, thereby saving bandwidth.

In a sixth case, when a timer-initiated retransmission of a packet occurs, and ISN=BSN, then RPEB should be set to TRUE. Otherwise, RPEB should be set to FALSE. Alternatively, RPEB can be set to TRUE when ((ISN=BSN) and (BSN≠DSN)), and can otherwise be set to FALSE.

A0054

US 6,424,625 B1

9

When a correct packet with RPEB=TRUE is received, then all packets preceding this packet and up to the next outstanding packet will be released from the buffer and forwarded to the higher layer. The application or the other layers decide whether the packets can be used or not, if delay and assembly requirements are met.

In the case where a window of size $<2^{k-1}$ is used, no additional discard capability concerns are necessary to consider, beyond the ordinary requirement imposed by Selective Reject itself.

In another embodiment of the invention for use with a Go-Back-N scheme, it is assumed that resynchronization takes place only when a NACK is received and N(R)<BSN. Then the transmitter will have full knowledge of the receiver state, i.e., ESN is known. Note that there exists a case where a NACK as described above is received and the receiver can wait one round-trip delay period to ensure full knowledge of the receiver state. In other words, when a retransmission of the NACKed packet has just been performed and it is not known if the packet has passed all buffers and other delay-causing functions, the receiver can wait one round-trip delay period. Here, renumbering of packets sequence number can be performed, such that the first ARQ packet sent after the renumbering will carry the same sequence number as that of the packet to which the NACK referred.

In FIG. 13, a NACK is received for a discarded packet, since ESN precedes BSN. Consequently, all subsequent packets from BSN and onwards are renumbered such that the BSN packet starts with ESN, the BSN+1 packet is renumbered to ESN+1, and so on. Note, renumbering is not performed for timer-initiated retransmissions.

In another embodiment of the invention for use with a basic Go-Back-N scheme, the receiver and the transmitter are resynchronized at each discard occasion. In this embodiment, ARQ packets can only be discarded if they have not previously been acknowledged.

The resynchronization is initiated by the transmitter, since it knows when a discard has been performed. The transmitter ask for a sequence number, up to which (but not including) the receiver has accepted ARQ packets. If the sequence number is before the last discarded sequence number, then the transmitter commands the receiver to start over from some arbitrarily chosen, but predefined, sequence number. The next sent packets are numbered upwards from this arbitrarily chosen sequence number. As an alternative, only the transmitter is resynchronized, such that the first packet sent after the resynchronization has the same sequence number as the next packet expected by the receiver.

In various embodiments of the invention, a magnitude of W can be defined when a call is initially set up between a transmitter and a receiver within a data network, in accordance with the particular application involved. For example, when the transmitter is initialized by a higher layer of software in the data network, it can select the magnitude of W and inform the receiver of this magnitude, and vice versa. The information indicating the magnitude of W can be sent from the transmitter to the receiver (or vice versa) using a control message.

In summary, the various embodiments of the invention increase throughput of a communications system using ARQ packets by discarding outdated packets. In addition, the various embodiments of the invention reduce a risk that the ARQ buffer in the transmitter will overflow. Those skilled in the art will also recognize that the principles described above with respect to the various embodiments of the invention can be applied to Stop-and-Wait ARQ schemes.

10

It will be appreciated by those skilled in the art that the present invention can be embodied in other specific forms without departing from the spirit or essential characteristics thereof, and that the invention is not limited to the specific embodiments described herein. The presently disclosed embodiments are therefore considered in all respects to be illustrative and not restrictive. The scope of the invention is indicated by the appended claims rather than the foregoing description, and all changes that come within the meaning and range and equivalents thereof are intended to be embraced therein.

What is claimed is:

1. A method for discarding packets in a data network employing a packet transfer protocol including an automatic repeat request scheme, comprising the steps of:

a transmitter in the data network commanding a receiver in the data network to a) receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet and b) release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet; and

the transmitter discarding all packets for which acknowledgment has not been received, and which have sequence numbers prior to the at least one packet.

2. The method of claim 1, wherein each of the at least one packet includes a receive enforcement bit, and the step of commanding comprises the steps of:

setting the receive enforcement bit for each of the at least one packet to a TRUE value; and

sending the at least one packet to the receiver.

3. The method of claim 1, wherein the step of commanding comprises the steps of:

setting a receive enforcement bit to a TRUE value for each at least one packet; and

sending the at least one receive enforcement bit set to TRUE together with identification of a transmitter sending the packets and the sequence numbers of the packets in a control message to the receiver.

4. The method of claim 1, wherein the method pertains to a go-back-n automatic repeat request scheme and further comprises the steps of:

defining a maximum top sequence number equal to a value (DSN+$2^{k-1}$), where DSN is a sequence number indicating that all packets having sequence numbers previous to DSN have been acknowledged by a receiver in the data network as having been received, and k is a number of bits in a sequence number field for a packet in the data network;

accepting a received packet when a receive enforcement bit for the received packet is set to TRUE and N(S)−ESN<$2^{k-1}$, where N(S) is a sequence number of the received packet and ESN is an expected sequence number of a next packet to be received; and

performing one of a) a restart of the automatic repeat request scheme and b) reporting a failure event to a management control system when the receive enforcement bit for the received packet is set to TRUE and N(S)−ESN$\geq 2^{k-1}$.

5. The method of claim 1, wherein the method pertains to a go-back-n automatic repeat request scheme and further comprises the steps of:

constraining a top sequence number TSN according to the rules (TSN$\leq$DSN−1), (TSN$\leq$BSN+W) and (1$\leq$W$\leq 2^{k-1}$), where k is a number of bits in a sequence

US 6,424,625 B1

11

number field for a packet in the data network, DSN is a sequence number indicating that all packets having sequence numbers previous to DSN have been acknowledged by a receiver in the data network as having been received, BSN is a bottom sequence number indicating a sequence number of an oldest packet stored in a transmit buffer of a transmitter in the data network, and W is a window size known to both the receiver and the transmitter, within which packets are tracked;

accepting a received packet when a receive enforcement bit for the received packet is set to TRUE and N(S)−ESN<$2^k$−W, where N(S) is a sequence number of the received packet and ESN is an expected sequence number of a next packet to be received;

performing one of a) a restart of the automatic repeat request scheme and b) reporting a failure event to a management control system when the receive enforcement bit for the received packet is set to TRUE and N(S)−ESN≧$2^k$−W; and

constraining BSN according to the rule (DSN≦BSN≦TSN).

6. The method of claim 1, wherein the method pertains to a selective repeat automatic repeat request scheme and further comprises the steps of:

constraining a bottom sequence number BSN indicating a sequence number of an oldest packet stored in a transmit buffer of a transmitter in the data network, and a top sequence number TSN according to the rules (DSN≦BSN≦TSN≦$TSN_{MAX}$), where DSN is a sequence number indicating that all packets having sequence numbers previous to DSN have been acknowledged by a receiver in the data network as having been received, $TSN_{MAX}$ is a maximum top sequence number, ($TSN_{MAX}$−DSN=$2^{k-1}$), and k is a number of bits in a sequence number field for a packet in the data network;

accepting a received packet when a receive enforcement bit for the received packet is set to TRUE and N(S)−ESN<$2^{k-1}$, where N(S) is a sequence number of the received packet and ESN is an expected sequence number of a next packet to be received; and

performing one of a) a restart of the automatic repeat request scheme and b) reporting a failure event to a management control system when the receive enforcement bit for the received packet is set to TRUE and N(S)−ESN≧$2^{k-1}$.

7. The method of claim 6, further comprising the steps of:

when a) a first packet having a sequence number after DSN and before BSN is negatively acknowledged, b) a number of packets that are prior to the first packet and not positively acknowledged is less than a difference between BSN and the sequence number of the first packet, and c) TSN≠BSN, setting a receive enforcement bit for the packet indicated by BSN and resending the packet indicated by BSN from the transmitter to the receiver.

8. The method of claim 6, further comprising the steps of:

when a) a first packet having a sequence number after DSN and before BSN is negatively acknowledged, b) a number of packets that are prior to the first packet and not positively acknowledged is less than a difference between BSN and the sequence number of the first packet, and c) TSN=BSN,

if a packet is pending for transmission, then setting a receive enforcement bit for the pending packet to

12

TRUE and sending the pending packet from the transmitter to the receiver;

if no packets are pending for transmission, then performing one of a) waiting until a packet is received from a higher layer and b) informing the receiver that no packets are pending.

9. The method of claim 6, further comprising the steps of:

when a) a first packet having a sequence number after DSN and before BSN is negatively acknowledged, b) a number of packets that are prior to the first packet and not positively acknowledged is greater than a difference between BSN and the sequence number of the first packet, and c) TSN≠BSN, setting a receive enforcement bit for a first outstanding packet after BSN and resending the first outstanding packet from the transmitter to the receiver.

10. The method of claim 6, further comprising the steps of:

when a) a first packet having a sequence number after DSN and before BSN is negatively acknowledged, b) a number of packets that are prior to the first packet and not positively acknowledged is greater than a difference between BSN and the sequence number of the first packet, c) at least one packet exists after the first packet, and d) there are no negatively acknowledged packets having sequence numbers after BSN, setting a receive enforcement bit for a first packet after BSN and resending the first packet after BSN from the transmitter to the receiver.

11. The method of claim 6, further comprising the steps of:

when a first packet having a sequence number after DSN and before BSN is negatively acknowledged, and all packets having sequence numbers greater than or equal to BSN and less than TSN have been positively acknowledged,

if a packet is pending for transmission, then setting a receive enforcement bit for the pending packet to TRUE and sending the pending packet from the transmitter to the receiver;

if no packets are pending for transmission, then performing one of a) waiting until a packet is received from a higher layer and b) informing the receiver that no packets are pending.

12. The method of claim 6, further comprising the steps of:

when a timer-initiated retransmission of a packet occurs, and ISN=BSN, setting a receive enforcement bit for the packet to TRUE; and

when a timer-initiated retransmission of the packet occurs, and ISN≠BSN, setting the receive enforcement bit for the packet to FALSE; wherein

ISN indicates a sequence number of a next packet to be sent.

13. The method of claim 6, further comprising the steps of:

when (ISN=BSN) and (BSN≠DSN), setting a receive enforcement bit for the packet to TRUE, and otherwise setting the receive enforcement bit for the packet to FALSE, where ISN indicates a sequence number of a next packet to be sent.

14. A method for discarding packets in a data network employing a packet transfer protocol including a go-back-n automatic repeat request scheme, comprising the steps of:

US 6,424,625 B1

**13**

discarding at least one packet from a transmitter;

receiving a NACK for the at least one packet from a receiver; and

assigning consecutive sequence numbers to non-discarded packets adjacent to the at least one packet.

**15**. A method for discarding packets in a data network employing a packet transfer protocol including a go-back-n automatic repeat request scheme, comprising the steps of:

a transmitter in the data network discarding at least one packet that has been sent by the transmitter but has not been acknowledged by a receiver in the data network as received;

after discarding the at least one packet, resynchronizing the transmitter and the receiver so that the last packet received by the receiver and the next packet to be transmitted by the transmitter have consecutive sequence numbers.

**16**. The method of claim **15**, wherein the step of resynchronizing comprises the steps of:

determining what sequence number the receiver expects to receive next; and

when the expected sequence number is different from the sequence number of the packet to be sent next from the transmitter, assigning the expected sequence number to the packet to be sent next from the transmitter.

**17**. The method of claim **15**, wherein the step of resynchronizing comprises the steps of:

**14**

determining what sequence number the receiver expects to receive next; and

when the expected sequence number is different from the sequence number of the packet to be sent next from the transmitter, commanding the receiver to expect a sequence number of a next packet to be sent from the transmitter to the receiver.

**18**. The method of claim **15**, wherein the step of resynchronizing comprises the step of commanding the receiver to expect a sequence number of a next packet to be sent from the transmitter to the receiver.

**19**. A method for discarding packets in a data network employing a packet transfer protocol including a go-back-n automatic repeat request scheme, comprising the steps of:

a transmitter in the data network discarding at least one packet that has been sent by the transmitter but has not been acknowledged by a receiver in the data network as received;

after discarding the at least one packet, resynchronizing the receiver and the transmitter by determining what sequence number the receiver next expects, and consecutively renumbering packets pending at the transmitter starting with the expected sequence number.

\*    \*    \*    \*    \*

# United States Court of Appeals
## for the Federal Circuit

*Wi-Fi One, LLC v. Broadcom Corporation,* 2015-1946 (IPR2013-00636)

## CERTIFICATE OF SERVICE

I, Elissa Matias, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by SKIERMONT PUCKETT LLP, counsel for Appellant to print this document.  I am an employee of Counsel Press.

On **October 26, 2015** counsel has authorized me to electronically file the foregoing **BRIEF OF THE APPELLANT** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

Dominic E. Massa
Kevin Goldman
Zachary Piccolomini
Katie Saxton
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
617-526-6000
dominic.massa@wilmerhale.com
kevin.goldman@wilmerhale.com
zachary.piccolomini@wilmerhale.com
kate.saxton@wilmerhale.com

Paper copies will also be mailed to the above principal counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court within the time provided in the Court's rules.

October 26, 2015                                      /s/ Elissa Matias
                                                            Counsel Press

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, I hereby certify that I am an attorney of record on behalf of Appellants Wi-Fi One, LLC and that I personally used the "word count" feature of Microsoft Word 2010 to count the words in the foregoing Brief of Appellant Wi-Fi One, LLC identified in the Rule 32(a)(7)(B)(iii) and determined that the foregoing brief contains 10,980 words and is therefore in compliance with Rule 32(a)(7)(B)(i).

In addition, this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.

By:

*/s/ Donald Puckett*
G. Donald Puckett
SKIERMONT PUCKETT LLP
2200 Ross Avenue, Suite 4800W
Dallas, Texas 75201
(214) 978-6600 (telephone)
(214) 978-6601 (facsimile)
Donald.Puckett@skiermontpuckett.com